## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### Atlanta Division

| | |
|---|---|
| D. H. PACE COMPANY, INC., | |
| Plaintiff, | |
| v. | Civil Action No. |
| MATTHEW JOHNSON and LIBERTY GARAGE DOOR SERVICES, LLC, | |
| Defendants. | |

## <u>Verified Complaint</u>

Plaintiff D. H. Pace Company, Inc. ("DH Pace") files this Verified Complaint against Defendants Matthew Johnson ("Johnson") and Liberty Garage Door Services, LLC ("Liberty"), showing the Court as follows:

### Preliminary Statement

This action involves Johnson's and Liberty's theft of DH Pace's trade secrets and confidential/proprietary information for their own financial gain. After enjoying employment at DH Pace for over five years, Johnson decided to start a competing business. That business is Liberty. To get an upper hand in this new venture, Johnson decided to take a shortcut by downloading and misappropriating DH Pace's trade secrets and other confidential/proprietary information. Even worse, Johnson did so even though he was subject to a restrictive covenant, which

included confidentiality, non-compete, non-solicit, and non-hire provisions. Through this action, DH Pace seeks to recover for these violations of federal and Georgia law.

## The Parties

1.      Plaintiff D. H. Pace Company, Inc. is a Delaware corporation with its principal place of business in Olathe, Kansas.

2.      Defendant Matthew Johnson is an individual who is domiciled in Georgia.

3.      Defendant Liberty Garage Door Services, LLC is a Georgia limited liability company with its principal place of business in Sandy Springs, Georgia. Upon information and belief, all members of Liberty reside in and are domiciled in Georgia.

## Jurisdiction and Venue

4.      The Court has subject-matter jurisdiction over this action, regardless of the amount in controversy, under 28 U.S.C. § 1331 because DH Pace is asserting claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Defend Trade Secrets Act, 18 U.S.C. § 1836, and under 28 U.S.C. § 1367.

5.      Under 28 U.S.C. § 1391, venue is proper in this Court because Defendants reside in and are domiciled in this District and because a substantial part of the events giving rise to this action occurred in this District.

## Background

**DH Pace's Business and Operations**.

6.     DH Pace is a national company that provides dock and door related products and services to home and business owners. It has been in operation since 1926.

7.     DH Pace operates 55 facilities throughout the United States, employing over 2900 individuals.

8.     In the Atlanta metropolitan area, DH Pace operates under the tradename "Overhead Door Company of Atlanta."

9.     The Overhead Door Company of Atlanta has served the Atlanta metropolitan area for over 85 years.

10.     Among other operations, the Overhead Door Company of Atlanta installs, maintains, repairs, sells, and services doors for both residential and commercial customers.

**DH Pace takes considerable measures to protect its trade secrets and other confidential information**.

11.     Through its decades of operations, DH Pace has created and developed proprietary and confidential information that qualifies as trade secrets. This information includes, but is not limited to:

   a.  Proprietary and confidential pricing formulas and lists for the sale of residential and commercial doors.

    b.   Proprietary and confidential pricing formulas and lists for the service, including parts and labor, and repair of doors.

    c.   Proprietary and confidential pricing formulas and lists for residential door openers.

    d.   Proprietary and confidential financial data for different DH Pace departments, including the residential department.

12.    DH Pace takes considerable measures to protect this information.

13.    In its Employee Handbook, which every employee must read and agree to abide by, DH Pace sets forth several policies related to confidential/proprietary information and trade secrets. These policies include, but are not limited to, the following:

    a.   The Computers/Electronic Devices Policy, which prohibits employees from disclosing "any confidential information to persons outside the Company. . . ."; using "this information for their own benefit, or for the profit or benefit of persons outside of the Company"; copying "any of this information"; and retaining "any of this information upon leaving the Company's employment."

    b.   The E-Mail System Policy, which specifies that "an employee should not send highly confidential materials over the e-mail system."

    c.   The Internet Policy, which specifies that the "[t]ransmission or reception of any material in violation of any governmental regulation is

4

prohibited which includes, but is not limited to, . . . material protected as a trade secret" and also prohibits "[s]ending or posting confidential material, trade secrets, or proprietary information outside the Company."

14.     Beyond these policies, DH Pace limits access to confidential/proprietary information and trade secrets through separate "server drives" and through permissions set by DH Pace's IT Department, ensure that this information can be accessed only by certain management level (or higher) employees.

15.     DH Pace also limits the information contained in some files to certain geographic regions, depending on the management level of the employee viewing the file.  For example, "scorecards" that contain substantial financial data and formulas, among other information, may be limited to a city, region, or national level, depending on the employee's management level.

16.     Additionally, DH Pace requires all employees to execute a Confidentiality, Non-Compete, and Non-Solicitation Agreement. Under this agreement, employees agree to not share confidential information:

> The Company considers its vendor agreements, pricing information, contracts, customer lists, financial information, the source of its suppliers, its customer agreements, the identity of its customers and information pertaining to acquisitions or potential acquisitions, as "Confidential Information." Therefore, it is necessary that you agree not to disclose or provide this Confidential Information to any other individual, company, corporation or other business entity. You further agree that upon termination of your employment (for any cause whatsoever) you will: (a.) return to the Company any records

5

(including computer files) that contain any such Confidential Information and will not keep copies or other documentation of same; and (b.) return all property of the Company in your possession, including, but not by way of limitation: brochures, catalogues, displays, samples, keys, company credit cards, cell phones and computer and other equipment.

17.     DH Pace also requires all employees to execute an Equipment and Confidentiality Agreement. Under this agreement, employees agree to protect and not share confidential information:

> I understand that all employees are responsible for safeguarding the Company's information. If I access Company information (including e-mail) from my personal equipment, I understand that I may not share it with, or transfer it to, any third parties at any time. In the event that my employment is terminated for any reason, promise to immediately return to the Company, or permanently destroy, all Company information stored on my equipment or otherwise in my possession or control.

> I acknowledge and understand that the Company considers its CONFIDENTIAL INFORMATION to include price lists and other pricing information, parts books, the Company's operating procedures and forms, customer lists and other customer information (including the identity of the Company's customers), the source of the Company's suppliers and other supplier information, the Company's financial information, all proposals, bids and related bidding information and takeoffs, and the Company's contracts, vendor agreements, distributorship agreements and customer agreements (hereinafter "Confidential information'). I understand that (am responsible for safeguarding the confidentiality of all Confidential Information; and I promise not to disclose or provide Confidential Information to any third parties (including individuals and business entities), at any time, including after my employment with the Company terminates (regardless of the reason it terminates). I understand that sharing the Company's Confidential information with outside entities could cause the Company irreparable harm and expose me to personal liability.

**DH Pace employs Johnson and allows him to access protected information; Johnson executes a confidentiality, non-compete, and non-solicitation agreement.**

18.     In October 2016, DH Pace hired Johnson as a Residential Dispatch Manager.

19.     In this role, Johnson managed 8 to 12 service technicians; assisted with daily scheduling of jobs; monitored technicians' schedules to maximize efficiency and profitability; processed completed jobs to ensure proper handling of materials and accurate billing; ensured maintenance schedules followed for fleet vehicles; used software and proprietary systems to generate department reports, including financial information; and ensured compliance with company hiring, discipline, and termination policies.

20.     As part of his employment, Johnson executed a Confidentiality, Non-Compete, and Non-Solicitation Agreement ("Agreement"). A true and correct copy of the Agreement is attached as "Exhibit A."

21.     Under the confidentiality provision of the Agreement, Johnson understood and agreed that:

> The Company considers its vendor agreements, pricing information, contracts, customer lists, financial information, the source of its suppliers, its customer agreements, the identity of its customers and information pertaining to acquisitions or potential acquisitions, as "Confidential Information." Therefore, it is necessary that you agree not to disclose or provide this Confidential Information to any other individual, company, corporation or other business entity. You further agree that upon termination of your employment (for any cause whatsoever) you will: (a.) return to the Company any records

(including computer files) that contain any such Confidential Infor-
mation and will not keep copies or other documentation of same; and
(b.) return all property of the Company in your possession, including,
but not by way of limitation: brochures, catalogues, displays, sam-
ples, keys, company credit cards, cell phones and computer and other
equipment.

(Exhibit A, p. 1).

22.     Under the "Agreement Not to Compete" provision of the Agreement,

Johnson understood and agreed that:

During your employment and for 12 months following the termina-
tion of your employment, you will not directly or indirectly engage
in, or acquire an interest in as an individual, partner, stockholder, di-
rector, officer, principal, agent, consultant or employee, any business
that is a direct competitor of the Company. For purposes of this agree-
ment, a "direct competitor" is any company, or company department
or division, that (a.) is located within the Atlanta, GA Metropolitan
Statistical Area, as defined by the U. S. Census Bureau (hereinafter,
the "Atlanta MSA"); and (b.) derives greater than 50% of its revenue
from the sales, installation or service of overhead doors, dock equip-
ment, commercial entry doors, automatic pedestrian doors, or inte-
grated security systems, or any combination of those business activi-
ties; and (c.) sources any of its products directly from the manufac-
turer of those products or is the manufacturer of such products. . . .
The Company and you recognize and agree that the time restriction
of 12 months is reasonable in light of the time required to hire and
train a replacement for your position. Since the majority of the Com-
pany's business is conducted within the Atlanta MSA, the territorial
restrictions in this agreement are necessary to protect the Company's
business and goodwill. Employee acknowledges that he will be able
to earn a livelihood without violating this provision. . . .

(Exhibit A, p. 1).

23.     Under the "Non-Solicitation" provision of the Agreement, Johnson

understood and agreed that:

Employee further promises and agrees that for a period of 2 (two) years from the date Employee's employment by the Company terminates, Employee will not contact or in any way solicit any customer of the Company with whom Employee had any contact or business dealings during the last 12 (twelve) months of Employee's employment by the Company. For purposes of this document "customer of the Company" includes any employee, representative, agent or owner of any customer of the Company with whom Employee had any contact or business dealings during the last 12 (twelve) months of Employee's employment.

Employee further promises and agrees that for a period of 2 (two) years from the date Employee's employment by the Company terminates, Employee will not contact or in any way solicit any vendor or independent contractor of the Company with whom Employee had any contact or business dealings during the last 12 (twelve) months of Employee's employment by the Company. For purposes of this document "vendor or independent contractor of the Company" includes any employee, representative, agent or owner of any vendor or independent contractor of the Company with whom Employee had any contact or business dealings during the last 12 months of Employee's employment.

Employee further promises and agrees that for a period of 2 (two) year from the date Employee's employment by the Company terminates, Employee will not solicit, recruit, hire or attempt to hire any employee of the Company, or otherwise interfere with the Company's business relationship with any of its employees.

(Exhibit A, p. 2).

24.    Under the "Remedy" provision in the Agreement, Johnson understood and agreed that "[a] violation of any of the covenants of this agreement will cause irreparable injury to the Company, and the Company, in addition to any other legal or equitable rights and remedies it may have, shall have the right to a court order enjoining and restraining the Employee from committing or

continuing to commit such violation." (Exhibit A, p. 2).

25.     Under the "Attorneys' Fees" provision in the Agreement, Johnson understood and agreed that "[t]he parties hereby agree that in the event a party incurs attorneys' fees or other litigation costs or expenses due to the violation or breach of this Agreement by the other party, that the non-breaching party shall be entitled to recover from the breaching party all such fees, costs and expenses." (Exhibit A, p. 2).

26.     Finally, at the end of the Agreement, Johnson understood and agreed that: "I HAVE BEEN GIVEN THE OPPORTUNITY TO SEEK LEGAL COUNSEL. I HAVE READ, UNDERSTAND AND ACCEPT THE TERMS OF THIS AGREEMENT." (Exhibit A, p. 2).

27.     As part of his employment, Johnson agreed that he will read the company's Employee Handbook and that he will "abide by the policies and rules stated and described in it, including all editions, amendments, revisions and supplements hereafter promulgated by the Company for incorporation herein."

28.     As part of his employment, Johnson executed an "Equipment and Confidentiality Agreement."

29.     Under the Equipment and Confidentiality Agreement, Johnson again agreed to protect and not share DH Pace's confidential information:

> I understand that all employees are responsible for safeguarding the Company's information. If I access Company information (including e-mail) from my personal equipment, I understand that I may not

share it with, or transfer it to, any third parties at any time. In the event that my employment is terminated for any reason, promise to immediately return to the Company, or permanently destroy, all Company information stored on my equipment or otherwise in my possession or control.

I acknowledge and understand that the Company considers its CON-FIDENTIAL INFORMATION to include price lists and other pricing information, parts books, the Company's operating procedures and forms, customer lists and other customer information (including the identity of the Company's customers), the source of the Company's suppliers and other supplier information, the Company's financial information, all proposals, bids and related bidding information and takeoffs, and the Company's contracts, vendor agreements, distributorship agreements and customer agreements (hereinafter "Confidential information'). I understand that I am responsible for safeguarding the confidentiality of all Confidential Information; and I promise not to disclose or provide Confidential Information to any third parties (including individuals and business entities), at any time, including after my employment with the Company terminates (regardless of the reason it terminates). I understand that sharing the Company's Confidential information with outside entities could cause the Company irreparable harm and expose me to personal liability.

30.     As part of his employment, Johnson certified that:

    a.   "it is my responsibility to read and understand the Company's Code of Business Conduct and Ethics (the 'Code') and I will adhere in all respects to the ethical and business conduct standards as described in the Code";

    b.   "it is my understanding to read and understand the Computer Software policy and I agree to abide by it during my employment with the Company"; and

    c.   "it is my responsibility to read and understand the General Network

Use Policy. My signature indicates receipt and understanding of Company Policy & Procedures for internet, e-mail, and other network use."

31.    After 2 years, Johnson was promoted to the role of Service Department Manager.

32.    In this role, among other responsibilities, Johnson oversaw the service department's operational activities; established current and long-range goals, plans, and policies; worked with senior management to review business results, including financial data; created division reports for senior management, including financial data; and led monthly sales/performance department meetings.

33.    Eventually, Johnson was demoted back to Residential Dispatch Manager due to performance issues.

34.    Under both roles, Johnson served as a manager; customarily and regularly directed the work of two or more other employees; and had authority to hire or fire other employees or had particular weight given to suggestions and recommendations as to the hiring, firing, and other employee status changes for others.

**Johnson improperly accesses and misappropriates DH Pace's confidential information and trade secrets for his new company**.

35.    After nearly 5 years of employment with DH Pace, while Johnson was still a Service Department Manager, he began crafting a plan to open a competing

business.

36.     To get an upper hand in this new venture, Johnson decided to take a shortcut by downloading and misappropriating DH Pace's trade secrets and other confidential/proprietary information for his own personal gain and not to further DH Pace's business.

37.     On January 13, 2021, Johnson, then a Service Department Manager, accessed DH Pace's trade secrets and confidential/proprietary information in the form of department "scorecards" and disclosed this information by emailing it to his personal email (mattjohnson2267@gmail.com) with the subject line "rev numbers."

38.     These "scorecards" contained substantial formulas and measurements that provided information on (1) DH Pace's revenue for that department; (2) DH Pace's average revenue per hour; (3) parts sales data; (4) production financial data; (5) number of products sold; and (6) technician hours. These scorecards also provide highly confidential, proprietary, and detailed metrics that disclose how DH Pace divides its technicians' time efficiently to maximize profit.

39.     Because of Johnson's role as a Service Department Manager, Johnson had access to scorecards not only for the Atlanta metropolitan area, but also the Southeast United States region.

40.     Two weeks later, on January 28, 2021, Johnson (still a Service Department Manager) accessed DH Pace's trade secrets and confidential/proprietary

information in the form of pricing formulas and lists and disclosed this information by emailing it to his personal email (mattjohnson2267@gmail.com) with the subject line "pricing."

41.    The trade secrets and confidential/proprietary information accessed and disclosed on January 28, 2021, includes (1) proprietary and confidential pricing formulas and lists for the sale of residential and commercial doors; (2) proprietary and confidential pricing formulas and lists for the service, including parts and labor, and repair of doors; and (3) proprietary and confidential pricing formulas and lists for residential door openers.

42.    The confidential information accessed and disclosed on January 28 also includes a list of all the technician employees for DH Pace's Atlanta operations, including the technicians' personal cell phone numbers and emails. This confidential information also includes contact information for DH Pace's suppliers.

43.    This confidential information sets DH Pace apart from its competitors because it can be compiled and reviewed with information from other locations, allowing DH Pace unique insight into the most competitive pricing and cost strategy for services and products not only nationwide, but for particular markets. In other words, this information assists DH Pace in determining financial and operational for services and products offered in its 55 locations throughout the country. This information was acquired through trial and error over decades, and it is not generally known or ascertainable by DH Pace's competitors.

14

**Johnson opens Liberty, a competing business**.

44.     On August 6, 2021, while still employed by DH Pace, Johnson formed a Georgia limited liability company named Liberty Garage Door Services, LLC.

45.     For the next several months, Johnson plotted and schemed to open and run this competing business, all while enjoying employment with DH Pace.

46.     In December 2021, after many months of planning, Johnson put in his "two weeks' notice" to DH Pace, advising his managers and employees that he was going into "real estate."

47.     On December 20, 2021, DH Pace allowed Johnson to take all of the service technicians that he managed out to breakfast at Cracker Barrel as a farewell event, with DH Pace covering the costs.

48.     One day later, Johnson left DH Pace's employment.  DH Pace later learned that Johnson was not going into "real estate." He opened Liberty, a competing business:

[REMAINDER OF PAGE LEFT BLANK]



49.     On its website (https://www.libertygarageservices.com), Liberty states that it offers garage door products and services, including, but not limited to, garage door installation, garage door opener installation, garage door repair, and garage door opener repair.

50.     These are the same products and services that DH Pace offers to its customers.

51.     On its website, Liberty states that it serves "the North Atlanta communities of Marietta, Roswell, Fulton, Sandy Springs, Buckhead, Dunwoody, Doraville, Decatur, Duluth, Norcross, Alpharetta, Peachtree Corners, John Creek, Buford, and surrounding areas with expert garage door and opener service and installation."

52.     This is the same area that DH Pace offers its products and services.

53.      On its website, Liberty also states that it was "formed with the mission to streamline the process of requesting expedient and competitively-priced service that results in returning time back to our customers."

54.     This "competitive pricing" comes from DH Pace's trade secrets and confidential/proprietary information.

55.     Liberty knew that Johnson is subject to confidentiality, non-compete, and non-solicit restrictive covenants.

**Johnson solicits DH Pace's employees to work at Liberty.**

56.     Beyond violating his noncompete and accessing/misappropriating DH Pace's trade secrets, Johnson (and Liberty) solicited, recruited, hired, and/or attempted to hire DH Pace's employees to work at Liberty.

57.     In December 2021/January 2022, Johnson and Liberty hired DH Pace employee Shafique Hussien ("Hussien") to work at Liberty. On information and belief, Johnson solicited and recruited Hussien for this job.

58.     In January 2022/February 2022, Johnson and Liberty solicited,

recruited, and/or attempted to hire DH Pace employee Chris Bryson to work at Liberty. Mr. Bryson turned down Johnson's attempt to hire him.

59.   Upon information and belief, Johnson and Liberty have solicited, recruited, and/or attempted to hire several other DH Pace employees to work at Liberty.

60.   Beyond individual solicitations, Johnson has also solicited and recruited DH Pace employees through Facebook posts, such as the following on February 25, 2022:



61.   Johnson posted these recruitment messages on Facebook, knowing

that he is Facebook friends with many DH Pace employees.

62.     Upon information and belief, Johnson instructed DH Pace employees, which he recruited and solicited, that these Facebook posts would serve as "code" to let them know he is ready to hire them, in an effort to get around violating his non-solicit agreement.

**DH Pace demands that Johnson cease and desist from competing; Johnson fails to respond**.

63.     On February 10, 2022, after discovering Johnson's unlawful activity, DH Pace instructed Johnson that he was violating the Confidentiality, Non-Compete, and Non-Solicitation Agreement that he signed during his employment with DH Pace.

64.     DH Pace demanded that Johnson "immediately cease and desist directly (or indirectly) competing with DH Pace, either as an individual owner of Liberty Garage Door Services, and/or as an employee of same, and continue to do so for a period of 12 months from the date you resign from/give up any interest in Liberty Garage Door Services."

65.     DH Pace also demanded that, if Johnson "may have engaged in the solicitation of DH Pace customers, vendors and/or employees," Johnson "immediately cease and desist such solicitation as such activity is a breach of your agreement with DH Pace not to engage in such activity."

66.     DH Pace further demanded that Johnson "immediately cease and

desist disclosure of same to anyone at Liberty Garage Door Services or elsewhere, and immediately return all DH Pace 'Confidential Information.'"

67.     Despite providing Johnson with an opportunity to resolve the issues above, DH Pace never received a response from Johnson. Thus, DH Pace has been forced to file this action.

68.     On February 11, 2022, DH Pace sent Liberty a letter informing it that Johnson's employment with and ownership in Liberty is a breach of the Confidentiality, Non-Compete, and Non-Solicitation Agreement between Johnson and DH Pace.

69.     DH Pace also demanded that Liberty immediately cease and desist interfering with DH Pace's contractual relationships.

70.     DH Pace stands to lose significant revenue and the erosion of the trade secrets' values should Johnson continue his unfettered usage of the information in the course of his business.

71.     DH Pace also stands to lose significant revenue and the erosion of its customers should Johnson continue to violate his non-compete covenant with Liberty's assistance.

**DH Pace learns that Hussien is working for Liberty in violation of his non-compete agreement**.

72.     In February 2011, DH Pace hired Hussien to work as a service technician.

73.     In this role, Hussien customarily and regularly solicited customers and prospective customers for DH Pace after being dispatched to the customers' location. These solicitations included repairs, sales, and services for garage doors, among other items.

74.     In January 2022, Hussien informed DH Pace that he would be leaving DH Pace's employment and that he was giving DH Pace his 2.5 days' notice.

75.     During an exit interview, Hussien informed DH Pace that he was planning to take "6 months off" and "spend time with his kids." Of course, this was not true.

76.     In reality, Hussien left DH Pace to join Liberty, a competing company, in January 2022.

77.     Like Johnson, during his employment, Hussien executed a Confidentiality, Non-Compete, and Non-Solicitation Agreement ("Hussien Agreement"). A true and correct copy of the Hussien Agreement is attached as "Exhibit B."

78.     Under the "Agreement Not to Compete" provision of the Hussien Agreement, Hussien understood and agreed that:

> During your employment and for 12 (twelve) months following the termination of your employment, you will not directly or indirectly engage in, or acquire an interest in as an individual, partner, stockholder, director, officer, principal, agent, consultant or employee, any business that is a Direct Competitor of the Company. For purposes of this Agreement, a "Direct Competitor" is any company, or company department or division, that (a) is located or conducts business activities within any Metropolitan Statistical Area in which the Company has or establishes an operating location or is conducting business; (b)

derives greater than 25% of its total revenue or over $10 million in total revenue from the sales, installation, inspection, maintenance or service of sectional doors, coiling doors, sliding doors, industrial doors, high speed doors, dock equipment, material handling equipment, commercial entry doors, automatic pedestrian doors, or integrated security system products, or any combination of those business activities; and (c) sources any of its products directly from the Manufacturer of those products or is the Manufacturer of any such products. As used in this Agreement, the term "Manufacturer" is defined as a company that is a member of any of the following industry associations: the International Door Association ("IDA"); the Door and Hardware Institute ("DHI"); the American Association of Automatic Door Manufacturers ("AAADM"); the Loading Dock Equipment Manufacturers ("LODEM"); Material Handling Equipment ("MHI"); the American Society for Industrial Security ("ASIS"); the Security Industry Association ("SIA") or their successor entities. Manufacturers which sell their products exclusively through a distributor or dealer network are excluded from the definition of a Direct Competitor. Field technicians/installers are only restricted from working for Direct Competitors in those Metropolitan Statistical Areas where they performed work for the Company. The Company and you recognize and agree that the time restriction of 12 months is reasonable in light of the time required to hire and train a replacement for your position. Since the majority of the Company's business is conducted within the MSA's, the territorial restrictions in this Agreement are necessary to protect the Company's business and goodwill. Employee acknowledges that he will be able to earn a livelihood without violating this provision.

(Exhibit B, p. 1).

79.     Hussien violated the restrictive covenants set forth in the Hussien Agreement by directly engaging in a business that is a direct competitor to DH Pace.

**Count I**
**Violation of the Defend Trade Secrets Act**
**(Johnson)**

80.     DH Pace alleges and incorporates by reference Paragraphs 1-79 as if set forth here.

81.     The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq.*, allows an owner of a trade secret to bring a civil action if that trade secret is misappropriated.

82.     Through significant cost, research, and time, DH Pace developed and maintained confidential and proprietary trade secrets related to its products and services ("DH Pace Trade Secrets"). The DH Pace Trade Secrets, include, but are not limited to, (1) proprietary and confidential pricing formulas and lists for the sale of residential and commercial doors; (2) proprietary and confidential pricing formulas and lists for the service, including parts and labor, and repair of doors; (3) proprietary and confidential pricing formulas and lists for residential door openers; and (4) department "scorecards."

83.     Through Johnson's employment and his position of trust, DH Pace provided Johnson with access to the valuable DH Pace Trade Secrets.

84.     The DH Pace Trade Secrets qualify as trade secrets under the DTSA and relate to products and services used in, or intended for use in, interstate commerce.

85.     The DH Pace Trade Secrets derive their independent economic value

23

from being unique to DH Pace and not being commonly known or available to the public or other persons who could obtain economic value from their disclosure or use.

86.    DH Pace takes, and has always taken, reasonable measures to protect the confidentiality and secrecy of its trade secrets and confidential/proprietary information, including the DH Pace Trade Secrets. As explained further in Paragraphs 12-17, these measures include, but are not limited to, (1) having employees execute multiple confidentiality agreements; (2) restricting access to the information; (3) setting password protections; and (4) requiring employees to read and agree to abide by various policies related to trade secrets and confidential/proprietary information.

87.    Despite these reasonable measures to protect the confidentiality and secrecy of the DH Pace Trade Secrets, Johnson accessed and misappropriated the DH Pace Trade Secrets by sending emails from his DH Pace email account to his personal email account on January 13 and 28, 2021.

88.    Johnson had no legitimate business reason to access, review, or download this information.

89.    Johnson accessed, misappropriated, and used the DH Pace Trade Secrets for the unlawful benefit to himself and Liberty and to the detriment of DH Pace.

90.    Johnson knew or should have known that the DH Pace Trade Secret

information that he accessed was (1) confidential, (2) acquired under circumstances giving rise to a duty to maintain its secrecy, (3) created and developed by DH Pace through significant cost, research, and time, (4) not generally available to the public or DH Pace's competitors; and (5) would benefit a company seeking to compete with DH Pace by replicating key information that allows DH Pace a competitive edge in the market place.

91.    Johnson knew, or had reason to know, that the access and misappropriation of the DH Pace Trade Secrets were illegal and violated the Confidentiality, Non-Compete, and Non-Solicit Agreement and various company policies, including the Computers/Electronic Devices Policy and the Internet Policy.

92.    Johnson continues to possess and use the DH Pace Trade Secrets, without DH Pace's authorization, including through Liberty, his competing business.

93.    Johnson's use, and continued use, of the DH Pace Trade Secrets gives Johnson and Liberty an unfair and unjust advantage in operating a competing business.

94.    As a direct and proximate cause of Johnson's misappropriation of the DH Pace Trade Secrets, DH Pace has suffered, and will continue to suffer, irreparable harm. Thus, under 18 U.S.C. § 1836(b)(3)(A), DH Pace is entitled to an injunction (1) enjoining Johnson from accessing, disclosing, misappropriating, or using the DH Pace Trade Secrets; and (2) requiring Johnson to return to DH Pace all of

the DH Pace Trade Secrets and other confidential/proprietary information in his custody or control.

95.     As a direct and proximate cause of Johnson's misappropriation of the DH Pace Trade Secrets, DH Pace has suffered damages and irreparable harm. Thus, DH Pace has a right to recover all damages and remedies set forth in 18 U.S.C. § 1836, including attorneys' fees.

96.     Because Johnson's acts of misappropriation were done willfully and maliciously, DH Pace also has a right to recover exemplary damages under 18 U.S.C. § 1836(b)(3)(C).

**Count II**
**Violation of the Georgia Uniform Trade Secrets Act**
**(Johnson)**

97.     DH Pace alleges and incorporates by reference Paragraphs 1-79 as if set forth here.

98.     The Georgia Trade Secrets Act of 1990 ("GTSA"), O.C.G.A. §§ 10-1-760, *et seq.*, allows an owner of a trade secret to bring a civil action if that trade secret is misappropriated.

99.     Through significant cost, research, and time, DH Pace developed and maintained confidential and proprietary trade secrets related to its products and services ("DH Pace Trade Secrets"). The DH Pace Trade Secrets, include, but are not limited to, (1) proprietary and confidential pricing formulas and lists for the sale of residential and commercial doors; (2) proprietary and confidential pricing

formulas and lists for the service, including parts and labor, and repair of doors; (3) proprietary and confidential pricing formulas and lists for residential door openers; and (4) department "scorecards."

100.    Through Johnson's employment and his position of trust, DH Pace provided Johnson with access to the valuable DH Pace Trade Secrets.

101.    The DH Pace Trade Secrets qualify as trade secrets under the GTSA.

102.    The DH Pace Trade Secrets derive their independent economic value from being unique to DH Pace and not being commonly known or available to the public or other persons who could obtain economic value from their disclosure or use.

103.    DH Pace takes, and has always taken, reasonable measures to protect the confidentiality and secrecy of its trade secrets and confidential/proprietary information, including the DH Pace Trade Secrets. As explained further in Paragraphs 12-17, these measures include, but are not limited to, (1) having employees execute multiple confidentiality agreements; (2) restricting access to the information; (3) setting password protections; and (4) requiring employees to read and agree to abide by various policies related to trade secrets and confidential/proprietary information.

104.    Despite these reasonable measures to protect the confidentiality and secrecy of the DH Pace Trade Secrets, Johnson accessed and misappropriated the DH Pace Trade Secrets by sending emails from his DH Pace email account to his

personal email account on January 13 and 28, 2021.

105.    Johnson had no legitimate business reason to access, review, or download this information.

106.    Johnson accessed, misappropriated, and used the DH Pace Trade Secrets for the unlawful benefit to himself and Liberty and to the detriment of DH Pace.

107.    Johnson knew or had reason to know that the DH Pace Trade Secret information that he accessed and disclosed was (1) confidential, (2) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, (3) created and developed by DH Pace through significant cost, research, and time, (4) not generally available to the public or DH Pace's competitors; and (5) would benefit a company seeking to compete with DH Pace by replicating key information that allows DH Pace a competitive edge in the market place.

108.    Johnson knew, or had reason to know, that the access and misappropriation of the DH Pace Trade Secrets were illegal and violated the Confidentiality, Non-Compete, and Non-Solicit Agreement and various company policies, including the Computers/Electronic Devices Policy and the Internet Policy.

109.    Johnson continues to possess and use the DH Pace Trade Secrets, without DH Pace's authorization, including through Liberty, his competing business.

110.    Johnson's use, and continued use, of the DH Pace Trade Secrets gives

Johnson and Liberty an unfair and unjust advantage in operating a competing business.

111.    As a direct and proximate cause of Johnson's misappropriation of the DH Pace Trade Secrets, DH Pace has suffered, and will continue to suffer, irreparable harm. Thus, under O.C.G.A. § 10-1-762, DH Pace is entitled to an injunction (1) enjoining Johnson from accessing, disclosing, misappropriating, or using the DH Pace Trade Secrets; and (2) requiring Johnson to return to DH Pace all of the DH Pace Trade Secrets and other confidential/proprietary information in his custody or control.

112.    As a direct and proximate cause of Johnson's misappropriation of the DH Pace Trade Secrets, DH Pace has suffered damages and irreparable harm. Thus, DH Pace has a right to recover all damages and remedies set forth in O.C.G.A. § 10-1-763, including attorneys' fees.

113.    Because Johnson's acts of misappropriation were done willfully and maliciously, DH Pace also has a right to recover exemplary damages under O.C.G.A. § 10-1-763(b).

### Count III
### Breach of Contract
### (Johnson)

114.    DH Pace alleges and incorporates by reference Paragraphs 1-79 as if set forth here.

115.    The Confidentiality, Non-Compete, and Non-Solicitation Agreement

("Agreement") is a valid and enforceable contract between DH Pace and Johnson.

116.   DH Pace completely performed its obligations under the Agreement.

117.   Any conditions precedent to Johnson's performance under the Agreement have been satisfied, performed, waived, or excused.

118.   Under the confidentiality provision of the Agreement, Johnson understood and agreed that:

> The Company considers its vendor agreements, pricing information, contracts, customer lists, financial information, the source of its suppliers, its customer agreements, the identity of its customers and information pertaining to acquisitions or potential acquisitions, as "Confidential Information." Therefore, it is necessary that you agree not to disclose or provide this Confidential Information to any other individual, company, corporation or other business entity. You further agree that upon termination of your employment (for any cause whatsoever) you will: (a.) return to the Company any records (including computer files) that contain any such Confidential Information and will not keep copies or other documentation of same; and (b.) return all property of the Company in your possession, including, but not by way of limitation: brochures, catalogues, displays, samples, keys, company credit cards, cell phones and computer and other equipment.

(Exhibit A, p. 1).

119.   Under the "Agreement Not to Compete" provision of the Agreement, Johnson understood and agreed that:

> During your employment and for 12 months following the termination of your employment, you will not directly or indirectly engage in, or acquire an interest in as an individual, partner, stockholder, director, officer, principal, agent, consultant or employee, any business that is a direct competitor of the Company. For purposes of this agreement, a "direct competitor" is any company, or company department or division, that (a.) is located within the Atlanta, GA Metropolitan

Statistical Area, as defined by the U. S. Census Bureau (hereinafter, the "Atlanta MSA"); and (b.) derives greater than 50% of its revenue from the sales, installation or service of overhead doors, dock equipment, commercial entry doors, automatic pedestrian doors, or integrated security systems, or any combination of those business activities; and (c.) sources any of its products directly from the manufacturer of those products or is the manufacturer of such products. . . . The Company and you recognize and agree that the time restriction of 12 months is reasonable in light of the time required to hire and train a replacement for your position. Since the majority of the Company's business is conducted within the Atlanta MSA, the territorial restrictions in this agreement are necessary to protect the Company's business and goodwill. Employee acknowledges that he will be able to earn a livelihood without violating this provision. . . .

(Exhibit A, p. 1).

120.   Under the "Non-Solicitation" provision of the Agreement, Johnson

understood and agreed that:

Employee further promises and agrees that for a period of 2 (two) years from the date Employee's employment by the Company terminates, Employee will not contact or in any way solicit any customer of the Company with whom Employee had any contact or business dealings during the last 12 (twelve) months of Employee's employment by the Company. For purposes of this document "customer of the Company" includes any employee, representative, agent or owner of any customer of the Company with whom Employee had any contact or business dealings during the last 12 (twelve) months of Employee's employment.

Employee further promises and agrees that for a period of 2 (two) years from the date Employee's employment by the Company terminates, Employee will not contact or in any way solicit any vendor or independent contractor of the Company with whom Employee had any contact or business dealings during the last 12 (twelve) months of Employee's employment by the Company. For purposes of this document "vendor or independent contractor of the Company" includes any employee, representative, agent or owner of any vendor or independent contractor of the Company with whom Employee had

any contact or business dealings during the last 12 months of Employee's employment.

Employee further promises and agrees that for a period of 2 (two) year from the date Employee's employment by the Company terminates, Employee will not solicit, recruit, hire or attempt to hire any employee of the Company, or otherwise interfere with the Company's business relationship with any of its employees.

(Exhibit A, p. 2).

121.   Johnson materially breached the Agreement by, among other acts:

a.  Disclosing and/or providing DH Pace's confidential information to other individuals, companies, corporations, or other business entities.

b.  Failing to return all records (including computer files) that contain any DH Pace's confidential information and keeping copies or other documentation of the same.

c.  Within 12 months following the termination of his employment, directly and/or indirectly engaging in, and/or acquiring an interest in as an individual, partner, stockholder, director, officer, principal, agent, consultant or employee, a business that is a direct competitor of DH Pace.

d.  Soliciting, recruiting, hiring, and/or attempting to hire employees of DH Pace, and/or otherwise interfering with DH Pace's business relationship with its employees.

e.  On information and belief, contacting and/or in any way soliciting

DH Pace's customers with whom Johnson had any contact or business dealings during the last 12 months of his employment.

f.   On information and belief, contacting and/or in any way soliciting DH Pace's vendors and/or independent contractors with whom Johnson had any contact or business dealings during the last 12 months of his employment.

122.   As a direct and proximate result of Johnson's material breaches of the Agreement, DH Pace is entitled to damages in an amount to be proven at trial, but at least $75,000.01.

123.   Under the "Attorneys' Fees" provision in the Agreement, John-son understood and agreed that "[t]he parties hereby agree that in the event a party incurs attorneys' fees or other litigation costs or expenses due to the violation or breach of this Agreement by the other party, that the non-breaching party shall be entitled to recover from the breaching party all such fees, costs and expenses." (Exhibit A, p. 2). Thus, due to Johnson's breach of the Agreement, DH Pace is en-titled to recover all of its attorneys' fees, costs, and expenses.

**Count IV**
**Violation of the Computer Fraud and Abuse Act**
**(Johnson)**

124.   DH Pace alleges and incorporates by reference Paragraphs 1-79 as if set forth here.

125.   The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et*

33

*seq.*, prohibits individuals from accessing computers and/or obtaining information either without authorization or by exceeding their authorized access.

126.   As detailed in Paragraphs 12-17, DH Pace takes considerable steps to protect its computer systems and the data contained in it.

127.   The computer that Johnson used to access DH Pace's computer system is a "protected computer," as defined by 18 U.S.C. § 1030(e), because it is used in or affecting interstate commerce or communication.

128.   Johnson was authorized to use DH Pace's computer system only to advance DH Pace's business interests and was prohibited from using the system, or the data contained in it, for his own purposes or the purposes of competing businesses.

129.   More than once in January 2021, Johnson knowingly and with intent to defraud accessed DH Pace's protected computer systems, without authorization and/or in excess of his authorization, to obtain trade secrets and other confidential/proprietary information.

130.   Johnson's knowing and willful use of DH Pace's protected computer system for non-business purposes was without authorized access and/or exceeded his authorized access in violation of the Confidentiality, Non-Compete, and Non-Solicitation Agreement, the DH Pace policies identified in Paragraph 14, and all other DH Pace policies governing the use of this computer system.

131.   Through this unauthorized access and/or access that exceeded

existing authorizations, Johnson obtained (1) proprietary and confidential pricing formulas and lists for the sale of residential and commercial doors; (2) proprietary and confidential pricing formulas and lists for the service, including parts and labor, and repair of doors; (3) proprietary and confidential pricing formulas and lists for residential door openers; and (4) department "scorecards," which contain substantial financial metrics and formulas.

132.    The value of the information that Johnson obtained and misappropriated exceeds $5,000.00, and DH Pace has incurred, and continues to incur, economic damages exceeding $5,000.00.

133.    As a direct and proximate result of Johnson's conduct, DH Pace has a right to recover all damages and relief allowed under 18 U.S.C. § 1030, including, but not limited to, DH Pace's costs in investigating Johnson's conduct, lost profits, and attorneys' fees.

**Count V**
**Breach of Fiduciary Duty**
**(Johnson)**

134.    DH Pace alleges and incorporates by reference Paragraphs 1-79 as if set forth here.

135.    Through his employment at DH Pace, Johnson had the authority to bind DH Pace on employment matters or relations.

136.    As a result of this employment, Johnson owed DH Pace a fiduciary duty not to act contrary to DH Pace's interests, including, but not limited to, a duty

to not solicit or attempt to hire DH Pace's employees to work at any competing company, including Liberty.

137.   Johnson breached the fiduciary duties that he owed to DH Pace by, among other acts, soliciting and attempting to hire DH Pace employees to work at Liberty, a competing company.

138.   As a direct and proximate result of Johnson's willful breach of this fiduciary duty, DH Pace has suffered, and will continue to suffer, damages and irreparable harm. Thus, DH Pace is entitled to damages in an amount to be proven at trial and injunctive relief.

**Count VI**
**Breach of Duty of Loyalty**
**(Johnson)**

139.   DH Pace alleges and incorporates by reference Paragraphs 1-79 as if set forth here.

140.   Through his employment at DH Pace, Johnson owed DH Pace a duty of loyalty, faithful service and regard for an employer's interest.

141.   Johnson breached his duty of loyalty by, among other acts, soliciting and attempting to hire DH Pace employees to work at Liberty, a competing company.

142.   As a direct and proximate result of Johnson's willful breach of his duty of loyalty, DH Pace has suffered, and will continue to suffer, damages and irreparable harm. Thus, DH Pace is entitled to damages in an amount to be proven

at trial and injunctive relief.

## Count VII
### Tortious Interference with Contract and Business Relations
### (Liberty and Johnson)

143.    DH Pace alleges and incorporates by reference Paragraphs 1-79 as if set forth here.

144.    Johnson and Liberty knew Hussien was subject to a Confidentiality, Non-Compete, and Non-Solicitation Agreement ("Hussien Agreement") with DH Pace.

145.    Johnson and Liberty also knew that the Hussien Agreement contained restrictive covenants that prohibited Hussien from directly or indirectly engaging in any business that competes with DH Pace.

146.    Despite their knowledge of the Hussien Agreement, and its restrictive covenants, Johnson and Liberty purposefully induced Hussien to breach the Hussien Agreement by hiring him and having him engage in a business that competes with DH Pace.

147.    Johnson and Liberty acted with malice by persuading Hussien to breach the Hussien Agreement because these actions were done for the sole purpose of benefitting Johnson and Liberty at the expense of DH Pace.

148.    As a direct and proximate cause of Johnson's and Liberty's tortious interference, DH Pace has suffered, and continues to suffer, damages in an amount to be determined at trial, but exceeding $75,000.00, and attorneys' fees.

## Count VIII
## Aiding and Abetting a Breach of Fiduciary Duty
## (Liberty)

149.   DH Pace alleges and incorporates by reference Paragraphs 1-79 as if set forth here.

150.   At all relevant times, Liberty knew that, as an employee, Johnson owed a fiduciary duty to DH Pace, his employer.

151.   With this knowledge, Liberty purposefully and improperly acted to procure a breach of Johnson's fiduciary duty, with the intent to injure DH Pace, by having Johnson solicit and attempt to hire DH Pace employees to work at Liberty, a competing business.

152.   Liberty's wrongful conduct procured a breach of Johnson's fiduciary duty by having Johnson solicit and attempt to hire DH Pace employees to work at Liberty.

153.   Liberty procured this breach and interfered with Johnson's fiduciary duty without authorization and without legal justification or excuse.

154.   As a direct and proximate cause of Liberty's tortious conduct, DH Pace has suffered, and continues to suffer, damages in an amount to be determined at trial, but exceeding $75,000.00, and attorneys' fees.

## Count IX
## Expenses of Litigation Under O.C.G.A. § 13-6-11
## (Johnson and Liberty)

155.   DH Pace alleges and incorporates by reference Paragraphs 1-79 as if

set forth here.

156.   Through the conduct identified in Paragraphs 1-79, Johnson and Liberty have acted in bad faith, have been stubbornly litigious, and/or have caused DH Pace unnecessary trouble and expense.

157.   As a result of this conduct, under O.C.G.A. § 13-6-11, DH Pace is entitled to recover from Johnson and Liberty all expenses of litigation, including attorney fees.

**WHEREFORE**, Plaintiff D. H. Pace Company, Inc. prays for the following relief against Defendants Matthew Johnson and Liberty Garage Door Services, LLC:

1.   A temporary restraining order to restrain and enjoin (1) Johnson from violating the restrictive covenants, including the non-competition and non-solicitation covenants, to which he agreed in the Confidentiality, Non-Compete, and Non-Solicitation Agreement; (2) Johnson and Liberty from disseminating, using, copying, possessing, or misappropriating any of DH Pace's trade secrets and confidential/proprietary information.

2.   A preliminary injunction to restrain and enjoin (1) Johnson from violating the restrictive covenants, including the non-competition and non-solicitation covenants, to which he agreed in the Confidentiality, Non-Compete, and Non-Solicitation Agreement; (2) Johnson and Liberty from

disseminating, using, copying, possessing, or misappropriating any of DH Pace's trade secrets and confidential/proprietary information.

3.      A permanent injunction enjoining, for a length of time sufficient to ensure that DH Pace enjoys the full benefit of its bargain, Johnson from violating the restrictive covenants, including the non-competition and non-solicitation covenants, to which he agreed in the Confidentiality, Non-Compete, and Non-Solicitation Agreement.

4.      An injunction under 18 U.S.C. 1836(b)(3)(A) for Johnson's violation of the DTSA (1) enjoining Johnson from accessing, disclosing, misappropriating, or using the DH Pace Trade Secrets; and (2) requiring Johnson to return to DH Pace all of the DH Pace Trade Secrets and other confidential/proprietary information in his custody or control.

5.      A judgment awarding DH Pace all damages and remedies allowed under 18 U.S.C. § 1836 for Johnson's violation of the DTSA, including, but not limited to, exemplary damages under § 1836(b)(3)(C).

6.      An injunction under O.C.G.A. § 10-1-762 for Johnson's violation of the GTSA (1) enjoining Johnson from accessing, disclosing, misappropriating, or using the DH Pace Trade Secrets; and (2) requiring Johnson to return to DH Pace all of the DH Pace Trade Secrets and other confidential/proprietary information in his custody or control.

7.     A judgment awarding DH Pace all damages and remedies allowed under O.C.G.A. § 10-1-763 for Johnson's violation of the GTSA, including, but not limited to, exemplary damages under § 10-1-763(b).

8.     A judgment awarding DH Pace monetary damages in an amount to be determined at trial, but at least $75,000.01, along with attorneys' fees, resulting from Johnson's breaches of contract.

9.     A judgment awarding DH Pace all damages and remedies allowed under 18 U.S.C. § 1030 for Johnson's violation of the CFAA, including, but not limited to, DH Pace's costs in investigating Johnson's conduct, lost profits, and attorneys' fees.

10.     A judgment awarding DH Pace monetary damages in an amount to be proven at trial, but at least $75,000.01, for Johnson's breach of fiduciary duties and injunctive relief prohibiting Johnson from further soliciting, recruiting, hiring, or attempting to hire DH Pace employees.

11.      A judgment awarding DH Pace monetary damages in an amount to be proven at trial, but at least $75,000.01, for Johnson's breach of duty of loyalty and injunctive relief prohibiting Johnson from further soliciting, recruiting, hiring, or attempting to hire DH Pace employees.

12.     A judgment awarding DH Pace monetary damages in an amount to be determined at trial, but at least $75,000.01, resulting from Johnson's and

Liberty's tortious interference with DH Pace's contract and business relationships.

13.    A judgment awarding DH Pace monetary damages in an amount to be determined at trial, but at least $75,000.01, resulting from Liberty's aiding and abetting Johnson's breach of fiduciary duty.

14.    A judgment awarding DH Pace the attorneys' fees and costs that it has incurred prosecuting this action under the Confidentiality, Non-Compete, and Non-Solicitation Agreement, O.C.G.A. § 13-6-11, and any other basis that the Court deems appropriate.

15.    Any other relief that the Court deems just and proper.

Respectfully submitted, this 11th day of March, 2022.

**FELLOWS LABRIOLA LLP**

/s/ Stephen T. LaBriola
Stephen T. LaBriola
Georgia Bar No. 431026
Ethan M. Knott
Georgia Bar No. 737481
Suite 2400 Harris Tower
233 Peachtree Street, NE
Atlanta, GA 30303
(404) 586-9200
slabriola@fellab.com
eknott@fellab.com

*Attorneys for Plaintiff D. H. Pace Company, Inc.*

## TYPE AND FONT CERTIFICATION

The undersigned certifies that the foregoing complies with Local Rule 5.1(C)

on typefaces and fonts.

s/Stephen T. LaBriola
Stephen T. LaBriola

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### Atlanta Division

D. H. PACE COMPANY, INC.,

      Plaintiff,

v.

MATTHEW JOHNSON and LIBERTY
GARAGE DOOR SERVICES, LLC,

      Defendants.

Civil Action No.

## **VERIFICATION**

My name is  John Nale.  I am an Area Vice President with Plaintiff D. H.

Pace Company, Inc. ("D. H. Pace").  I have reviewed the Verified Complaint in the

above-styled action, and I am duly authorized to execute this Verifiction in support

of the Verified Complaint on behalf of D. H. Pace.  The matters stated in the

Verified Complaint are not all within my personal knowledge, and I am informaed

that there is no officer or employee of D.H. Pace who has personal knowledge of

all such matters.  The facts stated within the Verified Complaint have been

assembled by authorized employees and counsel of D. H. Pace.  I am informed and

believe that the facts stated in the Verified Complaint are true and correct.

I declare, under penalties of perjury under the laws of the United States of America, that the foregoing is true and correct.

This 10th day of March, 2022.

_____
John Nale