**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| D.H. PACE COMPANY, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:22-cv-01005 |
| MATTHEW JOHNSON and LIBERTY GARAGE DOOR SERVICES, LLC, | |
| Defendants. | |

**DEFENDANTS' MATTHEW JOHNSON AND LIBERTY GARAGE
DOOR'S ANSWER TO PLAINTIFF'S SECOND AMENDED
COMPLAINT, AFFIRMATIVE DEFENSES,
AND COUNTERCLAIMS FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, AND ATTORNEYS' FEES**

COMES NOW Defendants Matthew Johnson ("M. Johnson") and Liberty

Garage Door Services, LLC ("Liberty") (collectively "Defendants") and respectfully

submit their Answer, Affirmative Defenses, and Counterclaims for Declaratory

Judgment, Injunctive Relief, and Attorneys' Fees in response to Plaintiff D. H. Pace

Company, Inc.'s ("DH Pace") Second Amended "Verified" Complaint showing the

Court as follows:

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint should be dismissed, in whole or in part, for failure to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The restrictive covenants upon which Plaintiff's claims are based in part are illegal, facially unenforceable, and un-modifiable restraints of trade under Georgia's Restrictive Covenant Act, O.C.G.A. § 13-8-50 *et seq.* (the "RCA").

### THIRD AFFIRMATIVE DEFENSE

The non-compete provision at issue is inapplicable even under the RCA because Liberty is not a "direct competitor" as defined in the Agreement as Liberty does not source any of its products directly from a manufacturer of those products and is not the manufacturer of such products.

### FOURTH AFFIRMATIVE DEFENSE

The RCA is unconstitutional, and the relevant covenants are facially unenforceable and incapable of modification as a matter of Georgia common law.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrines of waiver, estoppel, unclean hands, laches and/or failure of consideration.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff has failed to mitigate any damages it claims to have suffered.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's requests for equitable relief are barred to the extent it has adequate remedies at law.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims for tortious interference fail because the covenants upon which these claims are based are facially void and unenforceable. *See Fine v. Commun. Trends, Inc.*, 305 Ga. App. 298, 308 (2010) ("[B]ecause the non-solicitation covenant was void . . . Allscope could not be held liable for interfering with its enforcement.").

## NINTH AFFIRMATIVE DEFENSE

Defendant reserves the right to rely upon such other affirmative defenses as may be supported by the facts, including those set forth in his Verified Counterclaims filed in the instant matter, to be determined by full and complete discovery, and to voluntarily withdraw any affirmative defense.

## ANSWER

### Preliminary Statement

Defendants admit only that Plaintiff's unnumbered "Preliminary Statement" represents a summary of Plaintiffs' allegations contained in the Complaint. Defendants deny the factual basis of these allegations.

### The Parties

1.    Admitted only that Plaintiff is incorporated in the State of Delaware. Defendants are without sufficient knowledge to admit or deny whether DH Pace's principal place of business is in the State of Kansas, and therefore such allegations stand denied.

2.    Admitted.

3.    Admitted.

4.    Admitted.

### Jurisdiction and Venue

5.    Admitted only that Plaintiff's Complaint purports to assert claims under the Defend Trade Secrets, 18 U.S.C. § 1836 and under 28 U.S.C. 1367. Any remaining allegations in Paragraph 5 are denied.

6.      Admit only that Plaintiffs reside in and are domiciled in this District and a substantial part of the events set forth in Plaintiffs' Compliant occurred in this District. Any remaining allegations in Paragraph 6 are denied.

## Background

7.      Admitted that DH Pace is a national company that provides at a minimum dock and door related products and services to home and business owners. Defendants are without sufficient knowledge to admit or deny the remaining allegations set forth in Paragraph 7, and therefore such allegations stand denied.

8.      Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 8, and therefore such allegations stand denied.

9.      Admitted.

10.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 10, and therefore such allegations stand denied.

11.     Admitted.

12.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 12, and therefore such allegations stand denied.

13.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 13, and therefore such allegations stand denied.

14.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 14, and therefore such allegations stand denied.

15.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 15, and therefore such allegations stand denied.

16.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 16, and therefore such allegations stand denied.

17.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 17, and therefore such allegations stand denied.

18.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 18, and therefore such allegations stand denied.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted only that the Agreement, including the confidentiality provision, speaks for itself.  Any remaining allegations in Paragraph 22 are denied.

23.     Admitted only that the Agreement, including the agreement not to compete provision, speaks for itself.  Any remaining allegations in Paragraph 23 are denied.

24.     Admitted only that the Agreement, including the non-solicitation provision, speaks for itself.  Any remaining allegations in Paragraph 24 are denied.

25.     Admitted only that the Agreement, including the remedy provision, speaks for itself.  Any remaining allegations in Paragraph 25 are denied.

26.     Admitted only that the Agreement, including the Attorneys' fees provision, speaks for itself.  Any remaining allegations in Paragraph 26 are denied.

27.     Admitted only that the Agreement, including the end of the Agreement, speaks for itself.  Any remaining allegations in Paragraph 27 are denied.

28.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 28, and therefore such allegations stand denied.

29.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 29, and therefore such allegations stand denied.

30.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 30, and therefore such allegations stand denied.

31.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 31, and therefore such allegations stand denied.

32.     Admitted.

33.     Admitted.

34.     Admitted only that M. Johnson was demoted to Residential Dispatch Manager. The remaining allegations set forth in Paragraph 33 are denied.

35.     Admitted only that M. Johnson customarily and regularly directed the work of two or more employees under as both the Service Department Manager and Residential Dispatch Manager. Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 35, and therefore such allegations stand denied.

36.     Denied.

37.     Denied.

38.     Admitted only that M. Johnson sent an email to himself on January 13, 2021 for DH Pace business-related purposes which contained DH Pace "scorecards." The remaining allegations set forth in Paragraph 38 are denied.

39.     Admitted only that the "scorecards" contained information on DH Pace's revenue for that department, DH Pace's average revenue per hour; parts sales data; production financial data; number of products sold; and technician hours. The remaining allegations set forth in Paragraph 39 are stated as a legal conclusion and thus no response is required, but to the extent there is a response, the allegations are denied.

40.     Admitted.

8

41.     Admitted only that M. Johnson sent an email to himself on January 28, 2021, which contained pricing information he needed to fulfill his job duties for DH Pace. The remaining allegations set forth in Paragraph 41 are denied.

42.     Admitted only that the information M. Johnson sent himself on January 28, 2021 for DH Pace-related business purposes included information related to DH Pace's prices for residential and commercial doors; repair services; and garage door openers.  The remaining allegations set forth in Paragraph 42 are denied.

43.     Admitted only that the information M. Johnson sent himself on January 28, 2021 for DH Pace-related business purposes included contact information for DH Pace's Atlanta's employees and DH Pace's suppliers. The remaining allegations set forth in Paragraph 43 are denied.

44.     Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 44, and therefore such allegations stand denied.

45.     Denied.

46.     Denied.

47.     Admitted only that Matt Johnson and Craig Johnson discussed the possibility of opening a garage door business sometime in 2021. The remaining allegations set forth in Paragraph 47 are denied.

48.     Admitted only that Matt Johnson and Craig Johnson conversation about opening a garage door business continued for several months including during the time Matt Johnson was employed as a Residential Dispatch Manager for DH Pace and that Craig Johnson had no prior garage door industry experience at that time. The remaining allegations set forth in Paragraph 48 are denied.

49.     Admitted only that on August 6, 2021, Craig Johnson formed a Georgia limited liability company named Liberty Garage Door Services, LLC. The remaining allegations set forth in Paragraph 49 are denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Admitted only that Matt Johnson following standard protocol would sometimes mark a technician as needing to end his shift on time so that the technician could fulfill other schedule obligations including one time for a technician to attend a dinner with Matt Johnson. The remaining allegations set forth in Paragraph 53 are denied.

54.     Admitted only that Erik Ruhl, a DH Pace service technician informed Matt Johnson that Erik Ruhl intended to remain a DH Pace employee and was no

longer interested in a role with Liberty. The remaining allegations set forth in Paragraph 54 are denied.

55.     Admitted only that Matt Johnson informed Craig Johnson that Erik Ruhl was no longer interested in a role at Liberty. The remaining allegations set forth in Paragraph 55 are denied.

56.     Admitted only that Craig Johnson told Matt Johnson that Matt Johnson should tell Erik Ruhl to come to a dinner to discuss Liberty. The remaining allegations set forth in Paragraph 56 are denied.

57.     Admitted only that Craig Johnson wanted to meet with Erik Ruhl to tell him more about Liberty and convince him to join. The remaining allegations set forth in Paragraph 57 are denied.

58.     Admitted only that Craig Johnson proposed offering Erik Ruhl a $5,000 signing bonus if Erik Rule joined Liberty within the first 90 days after Liberty started. To the extent there are remaining allegations implied in the context of paragraph 58 which suggest wrongdoing on the behalf of Craig Johnson, such implications are expressly denied.

59.     Admitted only that Craig Johnson proposed offering Erik Ruhl a $5,000 signing bonus to convince Erik Ruhl to join Liberty. The remaining allegations set forth in Paragraph 59 are denied.

60.     Admitted that Matt Johnson sent a text message to Erik Ruhl on December 6, 2021 which Plaintiff quotes in Paragraph 60 and which speaks for itself. It is also admitted that Matt Johnson sent this text after discussing Erik Ruhl's decision to not join Liberty with Craig Johnson. To the extent there are remaining allegations implied in the context of paragraph 60 which suggest wrongdoing on the behalf of Matt or Craig Johnson, such implications are expressly denied.

61.     Admitted only that Matt Johnson offered Erik Ruhl a $5,000 signing bonus to convince Erik Ruhl to join Liberty as Erik Ruhl had previously stated he wanted to do. The remaining allegations set forth in Paragraph 61 are denied.

62.     Admitted that Matt Johnson sent a text message to Craig Johnson on December 6, 2021 which Plaintiff quotes in Paragraph 61 and which speaks for itself. To the extent there are remaining allegations implied in the context of paragraph 62 which suggest wrongdoing on the behalf of Matt Johnson, such implications are expressly denied.

63.     Admitted that Matt Johnson sent a text message to Craig Johnson on December 6, 2021 which Plaintiff quotes in Paragraph 63 and which speaks for itself. It is also admitted that Brian West was a Dispatch Manager for DH Pace on December 6, 2021 and that prior to that date Brian West had expressed his intention to join Liberty. To the extent there are remaining allegations implied in the context

of paragraph 63 which suggest wrongdoing on the behalf of Matt Johnson, such implications are expressly denied.

64.    Admitted only that Matt Johnson and Shafi Hussein spoke in person on December 7, 2021. The remaining allegations set forth in Paragraph 64 are denied.

65.    Admitted.

66.    Admitted only that Mr. Johnson put in his two weeks' notice in December 2021 and informed one or more DH Pace employees he was going into to "real estate." The remaining allegations set forth in Paragraph 65 are denied.

67.    Admitted that on December 8, 2021, Shafi Hussein told Matt Johnson that he wanted to work as a service technician for Liberty in the future. The remaining allegations set forth in Paragraph 67 are denied.

68.    Admitted.

69.    Admitted only that on December 10, 2021, Craig Johnson learned that Brian West and Shafi Hussien were employed at DH Pace as of December 10, 2021. The remaining allegations set forth in Paragraph 69 are denied.

70.    Admitted.

71.    Admitted.

72.    Admitted only that M. Johnson left DH Pace on December 21, 2021, did not go into real estate, began working with his uncle, Craig Johnson, at Liberty

Garage Door Services; and that the social media post pictured by in Plaintiff's Complaint speaks for itself. The remaining allegations set forth in Paragraph 48 are denied.

73.   Admitted.

74.   Admitted only that Liberty offers some services and products which DH Pace also offers. The remaining allegations set forth in Paragraph 74 are denied.

75.   Admitted.

76.   Denied to the extent the allegation implies that DH Pace only does business in the same area.

77.   Admitted.

78.   Denied.

79.   Denied.

80.   Admitted only that Liberty has hired former DH Pace employees. The remaining allegations set forth in Paragraph 80 are denied.

81.   Admitted that Brian West worked as a Dispatch Manager at DH Pace prior to December 21, 2021 and in that role he oversaw six to eight residential service technicians. The remaining allegations set forth in Paragraph 81 are denied.

82.     Admitted that Erik Ruhl worked as a residential service technician at DH Pace prior to December 21, 2021. The remaining allegations set forth in Paragraph 82 are denied.

83.     Admitted that Erik Ruhl expressed an interest at working for Liberty and that Erik Ruhl then decided to not work for Liberty. It is also admitted that Craig Johnson proposed offering a $5,000 signing bonus to Erik Ruhl after Erik Ruhl decided not to work for Liberty. The remaining allegations set forth in Paragraph 83 are denied.

84.     Admitted only that Liberty hired Shafique Hussein. The remaining allegations set forth in Paragraph 84 are denied.

85.     Denied.

86.     Denied.

87.     Admitted only that Matt Johnson made a Facebook post on February 24, 2022 which speaks for itself. The remaining allegations set forth in Paragraph 87 are denied.

88.     Admitted only that M. Johnson posted the messages referred to in Paragraph 88. Defendants deny any implication that such messages were targeted to any DH Pace employees.

89.     Denied.

90.     Admitted only that DH Pace sent a letter to M. Johnson on February 10, 2022 and that the letter speaks for itself. Any remaining allegations set forth in Paragraph 90 are denied.

91.     Admitted only that DH Pace's February 10, 2022 letter speaks for itself. Any remaining allegations set forth in Paragraph 91 are denied.

92.     Admitted only that DH Pace's February 10, 2022 letter speaks for itself. Any remaining allegations set forth in Paragraph 92 are denied.

93.     Admitted only that DH Pace's February 10, 2022 letter speaks for itself. Any remaining allegations set forth in Paragraph 93 are denied.

94.     Admitted only that DH Pace did not receive a response from M. Johnson. The remaining allegations set forth in Paragraph 94 are denied.

95.     Admitted only that DH Pace sent a letter to Liberty and Craig Johnson on February 11, 2022 and that the letter speaks for itself. Any remaining allegations set forth in Paragraph 95 are denied.

96.     Admitted only that DH Pace's February 11, 2022 letter speaks for itself. Any remaining allegations set forth in Paragraph 96 are denied.

97.     Admitted only that DH Pace did not receive a response from Craig Johnson or Liberty. The remaining allegations set forth in Paragraph 97 are denied.

98.     Denied.

99.    Denied.

100.   Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 100, and therefore such allegations stand denied.

101.   Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 101, and therefore such allegations stand denied.

102.   Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 102, and therefore such allegations stand denied.

103.   Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 103, and therefore such allegations stand denied.

104.   Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 104, and therefore such allegations stand denied.

105.   Admitted only that the Hussein Agreement speaks for itself.   Any remaining allegations in Paragraph 105 are denied.

106.   Admitted only that the Hussein Agreement, including the non-compete provision, speaks for itself.   Any remaining allegations in Paragraph 106 are denied.

107.   Denied.

108.   Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 108, and therefore such allegations stand denied.

109.   Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 109, and therefore such allegations stand denied.

110.   Denied.

111.   Admitted.

112.   Defendants admit that it is their understanding, Brian West informed DH Pace that he was leaving DH Pace's employment in December 2021. The remaining allegations set forth in Paragraph 112 are denied.

113.   Admitted that Brian West sent a text message to Matt Johnson which Plaintiff quotes in Paragraph 113 and which speaks for itself. Any remaining allegations in Paragraph 113 are denied.

114.   Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 114, and therefore such allegations stand denied.

115.   Defendants admit Brian West joined Liberty in January 2022. The remaining allegations and unsupported innuendo set forth in Paragraph 115 are denied.

116.   Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 116, and therefore such allegations stand denied.

117.   Admitted only that the West Agreement, including the non-compete provision, speaks for itself.  Any remaining allegations in Paragraph 117 are denied.

118.   Denied.

## Count I
## (Violation of the Defend Trade Secrets Act – Matt Johnson)

119.   Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

120.   Admitted.

121.   To the extent, through the use of broad descriptions, that Paragraph 121 alleges that the attachments Matt Johnson sent to his personal email were DH Pace's Trade Secrets, that allegation is denied. Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 121, and therefore such allegations stand denied.

122.   Admitted only that M. Johnson had access to certain information that Plaintiffs' complaint references as "DH Pace Trade Secrets." Any remaining allegations in Paragraph 122 are denied.

123.   Denied.

124.   Denied.

125.   Denied.

126.   Denied.

127.   Denied.

128.   Denied.

129. Denied.

130. Denied.

131. Denied.

132. Denied.

133. Denied.

134. Denied.

135. Denied.

136. Denied.

**Count II**
**(Violation of the Defend Trade Secret Act**
**– Craig Johnson and Liberty)**

137. Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

138. Admitted.

139. To the extent, through the use of broad descriptions, that Paragraph 139 alleges that the attachments Matt Johnson sent to his personal email were DH Pace's Trade Secrets, that allegation is denied. Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 139, and therefore such allegations stand denied.

140.   Admitted only that M. Johnson had access to certain information that Plaintiffs' complaint references as "DH Pace Trade Secrets." Any remaining allegations in Paragraph 140 are denied.

141.   Denied.

142.   Denied.

143.   Denied.

144.   Denied.

145.   Denied.

146.   Denied.

147.   Denied.

148.   Denied.

149.   Denied.

150.   Denied.

151.   Denied.

152.   Denied.

153.   Denied.

154.   Denied.

**Count III**
**(Violation of the Georgia Uniform Trade Secrets Act**
**– Matt Johnson)**

21

155.   Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

156.   Admitted.

157.   To the extent, through the use of broad descriptions, that Paragraph 157 alleges that the attachments Matt Johnson sent to his personal email were DH Pace's Trade Secrets, that allegation is denied. Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 157, and therefore such allegations stand denied.

158.   Admitted only that M. Johnson had access to certain information that Plaintiffs' complaint references as "DH Pace Trade Secrets." Any remaining allegations in Paragraph 158 are denied.

159.   Denied.

160.   Denied.

161.   Denied.

162.   Denied.

163.   Denied.

164.   Denied.

165.   Denied.

166.   Denied.

167.   Denied.

168.   Denied.

169.   Denied.

170.   Denied.

171.   Denied.

172.   Denied.

**Count IV
(Violation of the Georgia Uniform Trade Secrets Act
– Craig Johnson and Liberty)**

173.   Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

174.   Admitted.

175.   To the extent, through the use of broad descriptions, that Paragraph 175 alleges that the attachments Matt Johnson sent to his personal email were DH Pace's Trade Secrets, that allegation is denied. Defendants are without sufficient knowledge to admit or deny the allegations set forth in Paragraph 175, and therefore such allegations stand denied.

176.   Admitted only that M. Johnson had access to certain information that Plaintiffs' complaint references as "DH Pace Trade Secrets." Any remaining allegations in Paragraph 176 are denied.

23

177.   Denied.

178.   Denied.

179.   Denied.

180.   Denied.

181.   Denied.

182.   Denied.

183.   Denied.

184.   Denied.

185.   Denied.

186.   Denied.

187.   Denied.

188.   Denied.

189.   Denied.

190.   Denied.

## Count V
## (Breach of Contract – Matt Johnson)

191.   Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

192.   Denied.

193.   Admitted only that DH Pace employed M. Johnson on at-will basis. Any remaining allegations in Paragraph 193 are denied.

194.   Denied.

195.   Admitted only that the Agreement, including the confidentiality provision, speaks for itself.  Any remaining allegations in Paragraph 195 are denied.

196.   Admitted only that the Agreement, including agreement not to compete provision, speaks for itself.  Any remaining allegations in Paragraph 196 are denied.

197.   Admitted only that the Agreement, including the non-solicitation provision, speaks for itself.  Any remaining allegations in Paragraph 197 are denied.

198.   Paragraph 198 including sub-parts (a)-(f) is Denied.

199.   Denied.

200.   Admitted only that the Agreement, including the attorney fees' provision, speaks for itself.  Any remaining allegations in Paragraph 200 are denied.

## Count VI
## (Breach of Fiduciary Duty – Matt Johnson)

201.   Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

202.   Denied.

203.   Denied.

204.   Denied.

205.   Denied.

## Count VII
### (Breach of Duty of Loyalty – Matt Johnson)

206.   Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

207.   The allegations set forth in Paragraph 207 are stated as a legal conclusion and thus no response is required, but to the extent there is a response, the allegations are denied.

208.   Denied.

209.   Denied.

## Count VIII
### (Tortious Interference with Contract and Business Relations – Matt Johnson Liberty and Craig Johnson)

210.   Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

211.   Denied.

212.   Denied.

213.   Denied.

214.   Denied.

215.   Denied.

216.   Denied.

217.   Denied.

218.   Denied.

## Count IX

219.   Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

220.   Denied.

221.   Denied.

222.   Denied.

223.   Denied.

224.   Denied.

## Count X
### (Aiding and Abetting a Breach
### of Fiduciary Duty – Craig Johnson and Liberty)

225.   Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

226.   Denied.

227.   Denied.

228.   Denied.

229.   Denied.

230.   Denied.

## Count XI
### (Expenses of Litigation Under O.C.G.A. § 13-6-11
### – Matt Johnson, Craig Johnson, and Liberty)

231.   Defendants adopt and reassert their answers and defenses to the allegations contained in paragraphs 1 through 118 above as if fully set forth herein.

232.   Denied.

233.   Denied.

Defendants deny that Plaintiff is entitled to any of the relief it seeks in the unnumbered "Wherefore" paragraph in which Plaintiff requests relief, subparts 1- Defendants further deny each and every allegation stated in the Complaint, except where expressly admitted, and deny that Plaintiff is entitled to any remedies.

## COUNTERCLAIMS FOR DECLARATORY RELIEF, DAMAGES AND ATTORNEYS' FEES

COMES NOW Defendants M. Johnson and Liberty, assuming the role of Counter-Claimants, and file this Verified Counterclaims for Declaratory Judgment, Injunctive Relief, and Attorneys' Fees against Counter-Defendant DH Pace, respectfully showing as follows:

## THE PARTIES AND JURISDICTION

1.   M. Johnson is an individual resident of the State of Georgia and this District.  M. Johnson was formerly employed by DH Pace as detailed herein.

2.     Liberty is a Georgia limited liability company that maintains its principal place of business in this District.  All members of Liberty reside within this District.

3.     DH Pace is a Delaware corporation that maintains its principal place of business in Olathe, Kansas.

4.     All parties, by virtue of filing or responding to the Complaint and otherwise, are subject to the venue and jurisdiction of this Court, which is proper.

## GENERAL ALLEGATIONS

### M. Johnson's Employment With DH Pace

5.     DH Pace describes itself as a "national company" with a "network of offices across the US." https://www.dhpace.com/locations/.  "DH Pace has 2,800 total employees across all of its locations and generates $711.57 million in sales (USD). There are 34 companies in the D. H. Pace Company, Inc. corporate family."[1]

6.     In 2016, at the age of twenty-eight, M. Johnson was hired by DH Pace as a Residential Service Department Dispatch Manager.

7.     During his onboarding, M. Johnson was provided numerous new-hire documents he was required to execute.

---

[1] https://www.dnb.com/business-directory/company-profiles.d_h_pace_company_inc.eb111101931d2d03a556530ba1924672.html

8.     M. Johnson does not specifically remember executing the D.H. Pace "Confidentiality, Non-Compete and Non-Solicitation Agreement" at issue (the "Agreement") (Doc. 14-1), but believes if he did, he executed all new hire documents at the same time.

9.     After approximately two years in his Dispatch Manager role, M. Johnson was promoted to a Service Department Management position where he worked for a little more than two years until late March 2021.

10.     As a Service Department Manager, M. Johnson supervised a team of approximately 25-35 technicians.

11.     His responsibilities included monitoring daily and monthly performance goals, preparing presentations regarding department goals, managing inventory, and day to day operations.

12.     As a Service Department Manager, M. Johnson regularly visited technicians in the field.

13.     M. Johnson was also required to be "on call" certain weekends and while on call M. Johnson worked from his home and provided support to technicians such as price quotes and vendor contact information.

14.     Throughout M. Johnson's tenure, DH Pace's document management system and internal software was unreliable. It was not uncommon for M. Johnson

to be completely locked out of DH Pace's system for several hours, particularly on weekends.

15.     Given his frequent afterhours work and visits to the field, M. Johnson sent certain documents to his personal email for easy access offline on his mobile phone. M. Johnson did this from at least 2016.

16.     M. Johnson's supervisor was aware that he used his personal email for DH Pace work and never instructed M. Johnson to stop. DH employees commonly used their personal email addresses and phones for DH Pace business.

17.     Any emails M. Johnson sent to himself were sent for legitimate business purposes and to further DH Pace's business.

18.     A January 13, 2021 email M. Johnson sent to himself contained "Scorecards" which M. Johnson regularly used to coach his technicians during field visits.

19.     M. Johnson also used the "Scorecards" to set department goals, track the team's progress compared to prior years, and prepare presentations all of which he did afterhours.

20.     It was common practice for managers to send these types of documents to themselves. These documents were also regularly posted on the walls for all technicians to track their goals.

21.     A January 28, 2021 email M. Johnson sent to himself contained four documents M. Johnson needed to support technicians when he was "on call" or receiving calls after hours.

22.     The first document was a phone directory of all technicians.

23.     The second document titled "Atlanta Flat Rate Guide" contained quotes for common service jobs. M. Johnson relied on this document to provide quick service job quotes to technicians on weekends and afterhours.

24.     The final two documents were spreadsheets containing price and cost information for garage doors and operators or motors. M. Johnson had discretion in pricing these parts and used these cost spreadsheets to determine the price.

25.     Possessing copies of these documents for easy offline-access was necessary and efficient for M. Johnson and other DH Pace managers to accomplish their jobs.

### M. Johnson's Demotion

26.     In late March 2021 while still serving DH Pace as a Service Department Manager, M. Johnson was called into a meeting with Jeff Allen (Southeast Regional Manager) and Jeff Beatty (Atlanta General Manager) wherein M. Johnson was given the option to either accept a demotion back to a Dispatch Manager or be involuntary terminated.

27.     Although Mr. Allen and Mr. Beatty would not tell M. Johnson why, M. Johnson suspected it was because he had expressed opinions and concerns about business operations.

28.     With a young family to support, M. Johnson felt he had no option but to accept the demotion.

29.     M. Johnson was later told by the newly hired General Manager, Harold Earls, that M. Johnson was demoted as a "scapegoat."

### C. Johnson's Idea For Liberty

30.     Following his demotion, M. Johnson became concerned about his long-term opportunities at DH Pace for the first time, having never before considered leaving DH Pace.

31.     M. Johnson sought "life advice" from his father who is his uncle, Craig Johnson's ("C. Johnson") brother.  Sometime thereafter C. Johnson initiated very loose discussions with M. Johnson about the possibility of starting a garage door company in the future that C. Johnson would ultimately form and fund, but that M. Johnson could possibly join.

32.     At the time, C. Johnson had approximately thirty years' experience in running small and mid-sized companies and was interested in getting into the garage door business.

33.     In August 2021, C. Johnson decided to proceed with the formation of Liberty and C. Johnson filed a Certificate of Organization with the Georgia Secretary of State.

34.     Thereafter, C. Johnson started the process to secure financing for Liberty which eventually resulted in C. Johnson securing a $400,000 SBA loan through his contacts at Synovus Bank which did not close until December 30, 2021.

35.     As a requirement of the SBA loan, C. Johnson invested $100,000 of his own money into Liberty.  C. Johnson further secured accounting, insurance, banking, licensing and building space for Liberty leading up to the closing of the SBA loan around the start of 2022.

36.     Throughout these efforts by C. Johnson, M. Johnson continued to faithfully serve DH Pace, with minimal involvement in the formation of Liberty and the securing of necessary tasks for it to begin operations despite his correct understanding that he could lawfully "prepare to compete" without breaching any duties owed to DH Pace while still an employee.

37.     It was indeed ultimately decided that C. Johnson would make a capital contribution of $100,000 into Liberty and have a 70% ownership stake, and that M. Johnson, after leaving DH Pace, would have a 30% ownership stake with no personal capital contribution because he could not afford to do so.  An Operating Agreement

was drafted reflecting these membership interest percentages but never executed between C. Johnson and M. Johnson.

## M. Johnson's Resignation And Termination

38.     On or about December 7, 2021, M. Johnson provided DH Pace with a "two-weeks' notice" of resignation.  M. Johnson's termination became effective on or about December 21, 2021, *prior* to the SBA loan closing and Liberty commencing operations.

## M. Johnson Is Approached By DH Pace Employees About Liberty

39.     Prior and after his termination, M. Johnson was approached by DH Pace employees who initiated discussions expressing desire to work with M. Johnson at Liberty.

40.     These employees included Shafique Hussien and Chris Bryson.

41.     Mr. Hussein initiated contact with M. Johnson expressing an interest in following him to Liberty and was hired by Liberty in February 2022 after he had left the employment of DH Pace.

42.     Mr. Bryson initiated contact with M. Johnson after M. Johnson had left DH Pace and inquired about a position with Liberty, and M. Johnson eventually offered Mr. Bryson a position in response to Mr. Bryson's inquiry which Mr. Bryson ultimately declined.

43.     M. Johnson has not initiated contact with any DH Pace employee about leaving DH Pace and joining Liberty.

### Liberty's Business

44.     Liberty and M. Johnson have not solicited any DH Pace customers.

45.     Liberty acquires its business primarily through online advertisement. It only has two trucks and is focused on residential garage door installation and repair.

46.     Unlike DH Pace, Liberty does not do any residential construction.

47.     Liberty does not source its products from the same suppliers as DH Pace. While DH Pace sources its products directly from manufacturers, Liberty sources all of its products from distributors and not from manufacturers.

### The Restrictive Covenants In The Agreement Are Unenforceable Under Georgia's Restrictive Covenant Act (the "RCA")

<u>The Non-Compete Provision is Facially Invalid Under the RCA and Cannot Be Saved by the Court's Limited "Blue-Penciling" Powers</u>

48.     The Agreement contains an "Agreement Not To Compete" (the "non-compete provision") which states:

> During your employment and for 12 months following the termination of your employment, you will not directly or indirectly engage in, or acquire an interest in as an individual, partner, stockholder, director, officer, principal, agent, consultant or employee, any business that is a direct competitor of the Company.

49.     The language above does not contain any geographical limitation.

50.    The Agreement defines "direct competitor" as:

For purposes of this agreement, a "direct competitor" is any company, or company department or division, that (a.) *is located within the Atlanta, GA Metropolitan Statistical Area*, as defined by the U. S. Census Bureau (hereinafter, the "Atlanta MSA"); and (b.) derives greater than 50% of its revenue from the sales, installation or service of overhead doors, dock equipment, commercial entry doors, automatic pedestrian doors, or integrated security systems, or any combination of those business activities; and (c.) *sources any of its products directly from the manufacturer of those products or is the manufacturer of such products. . . .*
(emphasis added).

*The Non-Compete Agreement Fails Under the RCA for Lack of a Geographic Limitation.*

51.    The ordinary meaning of the word "located" is to be physically present somewhere.   For example, the Courts of the Northern District of Georgia are "located" in Atlanta, Gainesville, Newnan, and Rome.   By the plain language of the Agreement, M. Johnson is prevented from working *anywhere* in the Universe for a company *if* that company has a location within the Atlanta MSA.   There is thus no territorial limitation associated with the non-compete provision.

52.    To illustrate, M. Johnson could not work for ACME Door Co. in Utah, Europe, or on Mars if ACME Door Co. is also located within the Atlanta MSA.

53.    This plain reading of the covenant is evidenced by DH Pace's own website lists which its "locations" (i.e. where DH Pace is "located").   See https://www.dhpace.com/about-us/locations/.   The   webpage   states   "OUR

LOCATIONS" and contains a map showing DH Pace's "locations":



54.     DH Pace's assertion that the non-compete provision is geographically limited to the Atlanta MSA is further refuted as DH Pace asks this Court to enjoin M. Johnson from engaging in the garage door business anywhere.  [Doc. 2-1, p. 23].

55.     Because the non-compete provision does not contain any required geographic limitation, it is facially void, unenforceable, and incapable of modification under the Court's limited blue-penciling" power under the RCA.

56.     As this Court and Georgia state courts has repeatedly held, under the RCA a reasonable territorial limitation associated with a non-compete agreement is *specifically* required (O.C.G.A. § 13-8-53(a)), and such a provision is void and incapable of saving via blue-pencilling if it does not contain such a limitation. *Lifebrite Labs., LLC v. Cooksey*, No. 1:15-CV-4309-TWT, 2016 U.S. Dist. LEXIS 181823, at *19 (N.D. Ga. Dec. 9, 2016) (holding non-compete without geographic area unenforceable); *ID Tech. v. Hamilton*, 2014 U.S. Dist. LEXIS 198732, at *2

(N.D. Ga. Mar. 24, 2014) (concluding lack of geographic area restriction renders restrictive covenant unenforceable); *Wind Logistics Prof'l v. Universal Truckload, Inc.*, No. 1:16-cv-00068, 2019 U.S. Dist. LEXIS 161720, at *27 (N.D. Ga. Sep. 23, 2019) (concluding covenant "has no geographical limitation and does not list competitors for whom Parson/Wind Logistics can and cannot work. To add these restrictions would be adding a material term, which the Court cannot do."); *Chef Merito v. Javier Gonzalez*, No. 1:20-cv-1242-AT, 2020 U.S. Dist. LEXIS 171934, at *19 (N.D. Ga. Aug. 19, 2020) ("The Court cannot save the Non-Compete Agreement by adding as a geographical limitation the regional sales routes."); *see also CarpetCare Multiservices, LLC v. Carle*, 347 Ga. App. 497, 500 (2018) ("Because the non-compete covenant did not contain any reference to a geographic area limitation, it failed to comply with OCGA § 13-8-53 (a), and, thus, the trial court correctly determined that it was void and unenforceable.") (physical precedent only); *CCmulti, LLC v. Carle*, 2017 Ga. Super. LEXIS 588, *12 (Oct. 31, 2017) ("the Court cannot 'blue pencil' in a geographic limitation where none existed before"); *Tasktop Techs. US Inc. v. McGowan*, No. 18-1075-RGA, 2018 U.S. Dist. LEXIS 175080, at *12 n.9 (D. Del. Oct. 11, 2018) ("If Georgia law applies, the Agreement appears even more likely to be unenforceable because it lacks a geographic area restriction.").

57.     As this Court previously held in Judge Thrash's *Lifebrite Labs* decision: "Though courts may strike unreasonable restrictions, and may narrow over-broad territorial designations, courts may not completely reform and rewrite contracts by supplying new and material terms from whole cloth."   2016 U.S. Dist. LEXIS 181823, at *19.   This Court cannot impose an arbitrary territory into the Agreement in light of DH Pace's failure to do so.

58.     The non-compete provision is thus facially void and unenforceable and cannot be saved by the Court's limited blue-pencil power under the RCA.

*The Non-Compete Provision Fails Under the RCA for "Any Capacity".*

59.     The non-compete is also facially void because it prevents working for a competitor in any capacity.

60.     The RCA requires restrictive covenants to be "reasonable in time, geographic area, ***and scope of prohibited activities***."   O.C.G.A. § 13-8-53(a) (emphasis added). "Activities, products, or services shall be considered sufficiently described if a reference to the activities, products, or services is provided and qualified by the phrase "of the type conducted, authorized, offered, or provided within two years prior to termination" or similar language containing the same or a lesser time period."   O.C.G.A. § 13-8-53(c)(2).

61.     In *Burbach v. Motorsports of Conyers*, No. A21A1420, 2022 Ga. App.

LEXIS 140 (Ct. App. Mar. 10, 2022), the Georgia Court of Appeals recently held that under the RCA, covenants that do not limit the scope of restricted activities a former employee can engage in are facially unenforceable and incapable of blue-pencilling.

62.    The Court explained:

> while the covenants stated that Burbach could not work for the Appellees' competitors, they did not specify the types of activities that would be prohibited. Although OCGA § 13-8-56 (3) states that "[t]he scope of competition restricted is measured by the business of the employer[,]" covenants that do not list specific limits on the type of activity, and effectively bar former employees from working in any capacity for competitors, have been deemed overbroad and unreasonable.

*Burbach*, No. A21A1420, 2022 Ga. App. LEXIS 140, at *6-7 (citing *Carson v. Obor Holding Co., LLC*, 318 Ga. App. 645, 652 (2012) and *Stultz v. Safety & Compliance Mgmt.*, 285 Ga. App. 799, 802 (2007)).

63.    Consistent with this Court's decision in *Lifebrite Labs* and the many other cases cited herein, the Court in *Burbach* could *not* have blue-penciled the non-compete to add "specific limits on the type of activity," because none existed.

64.    The *Burbach* Court notably also held a territorial restriction overbroad but declined to modify the territory.  *Id.* at 2022 Ga. App. LEXIS 140, at *11, n.8 ("Although Georgia courts may apply the 'blue pencil' doctrine and modify unreasonable restrictive covenants, Georgia courts are not required to do so.").

65.     The non-compete provision is further unenforceable because it even prevents M. Johnson from working for a manufacturer (in any capacity and anywhere in the Universe). There is no legitimate business purpose in preventing M. Johnson from working for a manufacturer potentially selling products to garage door companies.

*The Non-Compete is Inapplicable Under the RCA Because Liberty is Not a "Direct Competitor".*

66.     The non-compete provision is inapplicable in this case because Liberty is not a "direct competitor" under the Agreement's own definition of same.

67.     The Agreement's plain language only restricts competition associated with a "direct competitor".

68.     To be a "direct competitor" under the Agreement a competitor must, "…***source[s] any of its products directly from the manufacturer of those products…"*** (emphasis added).

69.     Liberty does not source *any* of its products directly from the manufacturer of those products. Instead, it buys all its products from distributors.

<u>The Non-Hire Provision is Facially Invalid Under the RCA Because of Its
Blanket No-Hire Clause and Failure to Comply with Requirements of the RCA
Rendering it Incapable of Blue-Penciling Under the RCA</u>

70.     The employee no-hire provision is facially invalid and states:

Employee further promises and agrees that for a period of 2 (two) years from the date Employee's employment by the Company terminates, Employee will not solicit, recruit, **hire or attempt to hire** any employee of the Company, **or otherwise interfere with the Company's business relationship with any of its employees**.

(emphasis added).

*Blanket no-hire provisions are unenforceable.*

71.     Decisions from Georgia state courts and this Court (affirmed by the 11th Circuit) and have confirmed that blanket no-hire provisions such as that in the Agreement are facially overbroad and unenforceable.

72.     In *Reed v. Belt Power, LLC*, the Court issued a declaratory judgment and permanent injunction under the RCA that a blanket no-hire provision was unenforceable because it bars even unsolicited contact and hiring of employees. Civil Action No. 17109280, at 9 & n.3 (Cobb County Superior Court, Mar 18, 2019) (holding blanket no-hire provisions unenforceable),[2] *aff'd Belt Power v. Reed*, 354 Ga. App. 289 2020).

73.     Similarly, in *Wetherington v. Ameripath, Inc.*, 566 F. App'x. 850, 852 (11th Cir. 2014) the 11th Circuit affirmed this Court's decision finding that a "blanket prohibition" against hiring former employer's employees is an unreasonable restraint on competition under Georgia law.

---

[2] A copy of the Superior Court's *Belt Power* Order is located at Doc. 14-2.

74.     These decisions follow the common law.  S*ee*, *e.g.*, *Cox v. Altus Healthcare & Hospice, Inc.*, 308 Ga. App. 28, 32 (2011) ("The nonrecruitment provision is likewise invalid on its face because it bars Cox from even unsolicited contact with Altus employee.").

*The No-Hire Provision's Failure to Comply with Requirement of RCA.*

75.     "Covenants not to hire or recruit employees are governed by the RCA and "must comply with the terms of the Act." *Belt Power*, 354 Ga. App. at 293.

76.     The RCA defines "restrictive covenant," in part, to include: "an agreement between two or more parties that exists to protect the first party's or parties' interest in…employees." O.C.G.A. § 13-8-51(15).

77.     "In **any** action concerning enforcement of a restrictive covenant, a court shall not enforce a restrictive covenant **unless** it is in compliance with the provisions of Code Section 13-8-53." O.C.G.A. § 13-8-54(b) (emphasis added).

78.      "Taken together, the clear and plain language of these two provisions compels a conclusion that **any** agreement that meets the Act's definition of restrictive covenant, and is otherwise not excepted from the Act's provisions, is subject to the terms of the Act and must comply with the terms of the Act." *Belt Power*, 354 Ga. App. at 293 (emphasis added).

79.     In a recent Order, Judge Davis of the Georgia State-Wide Business Court applied *Belt Power* to hold: "The lack of any geographic or similar limitation is fatal to the enforcement of these [non-recruitment] covenants." *Martin v. Hauser, Inc.*, No. 20-GSBC-0008, at 33 (Ga. State-Wide Business Court, Mar. 5, 2021).[3]

80.     As explained in *Martin*, restrictions on hiring or recruiting employees are construed as "'restrict[ing] competition during the term of a restrictive covenant,' such that they must be 'reasonable in time, geographic area, and scope of prohibited activities.'" *Id.* (citing O.C.G.A. § 13-8-53(a)).

81.     The no-hire provision in the Agreement contains no geographic area and is thus facially unenforceable.

82.     The no-hire provision also fails for lack of any scope of prohibited activities (i.e., limiting recruitment for competitive purposes but not to work in an ice cream shop).

83.     Again, as with a geographic area, the RCA requires covenants that restrict competition to have a description of the "activities, products, or services… that provides fair notice of the maximum reasonable scope of the restraint." O.C.G.A. § 13-8-53(c)(1).

_____

[3] A copy of the State-wide Business Court's Order is located at Doc. 14-3.

84.     Any such description "shall be construed ultimately to cover only so much of such estimate as relates to the activities actually conducted, the products or services actually offered, . . . within a reasonable period of time prior to termination." *Id.*

85.     The no-hire provision in the Agreement contains no limitation related to the scope of activities conducted by M. Johnson prior to termination that are restricted.

86.     Instead, the provision prohibits M. Johnson hiring any DH Pace employees into *any* business even if completely unrelated to DH Pace (like an ice cream shop) or interfering with DH Pace employees and encouraging them to leave for any reason whatsoever (even personal ones).

87.     The no-hire provision thus fails to "comply with the terms of the Act," *Belt Power*, 354 Ga. App. at 293, and "is unreasonable and unenforceable as written," *Martin*, at 36.

88.     The no-hire provision is further overbroad because it is not limited to those employees with whom M. Johnson had a business relationship while working for DH Pace.

89.     M. Johnson has no way of knowing the identity of all 2,800 DH Pace employees. *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1242 (11th Cir.

2005) ("[T]he employee non-solicitation provision, which sets no geographical or relationship restriction, but rather prohibits . . . soliciting any . . . employee, regardless of place or prior relationship . . . .  The Georgia courts have refused to enforce such provisions."); *Wetherington*, 566 Fed. App'x. at 852 (covenant impermissibly barred former employee from hiring even such former employees with whom he had no relationship during his employment).

90.    Because of its lack of compliance with the express requirements of the RCA to include geographic and/or contact-related restrictions, the no-hire provision is incapable of saving under the Courts limited blue-penciling authority under the RCA.  *Lifebrite Labs*, 2016 U.S. Dist. LEXIS 181823, at *19.  ("Though courts may strike unreasonable restrictions, and may narrow over-broad territorial designations, courts may not completely reform and rewrite contracts by supplying new and material terms from whole cloth.").  2016 U.S. Dist. LEXIS 181823, at *19.

*The No-Hire Provision Fails for Lack of any Legitimate Business Interest.*

91.    The no-hire provision is further unenforceable because DH Pace has no legitimate business interest in restricting hiring of all its employees.

92.    The only example in the RCA of a legitimate business interest related to employees is: "Extraordinary or specialized training."  O.C.G.A. § 13-8-51(9)(E).

93.     Accordingly, a valid non-recruitment provision should be limited to protecting employees who receive extraordinary or specialized training.  *See ALW Mktg. Corp. v. Drunasky*, CIVIL ACTION NO. 1:91-cv-545-RLV, 1991 U.S. Dist. LEXIS 20326, at *18 (N.D. Ga. Dec. 30, 1991) (finding non-recruitment covenant unreasonable under common law because it "covers the administrative staff, which presumably includes even clerical and janitorial employees").

<u>The Court Should Decline To Exercise Any Blue Penciling Authority It Finds It Has In This Matter Under The RCA</u>

94.     The relevant covenants in this case were drafted exclusively by DH Pace.

95.     To the extent the Court finds it has authority to blue-pencil any of the relevant restrictive covenants, it should exercise its decline to do so because of the patent overreaching by DH Pace in drafting the covenants.  *Burbach*, 2022 Ga. App. LEXIS 140, at *11, n.8 (Court finding a territorial restriction overbroad but declining to modify the territory holding, "Although Georgia courts may apply the 'blue pencil' doctrine and modify unreasonable restrictive covenants, Georgia courts are not required to do so.").

96.     In enacting the RCA, "the legislature's stated intent [was] to provide reasonableness and certainty" by providing statutory guidance on the drafting of restrictive covenants.  *Blair v. Pantera Enters., Inc.*, 349 Ga. App. 846, 849 (2019);

O.C.G.A. § 13-8-50.

97.    The goal was not to enforce all covenants or to relieve employers from the obligation to draft reasonable restrictions. As this Court has stated: "Employers are sophisticated entities. They have the ability to research the law in order to write enforceable contracts; courts should not have to remake their contracts in order to correct their mistakes." *Lifebrite*, 2016 U.S. Dist. LEXIS 181823, at *19.

98.    In the covenant context, the Georgia Court of Appeals recently reaffirmed that "[c]ourts do not make contracts for the parties," and "**should hesitate to rewrite private contracts**." *Daneshgari v. Patriot Towing Servs.*, No. A21A0887, 2021 Ga. App. LEXIS 513, at *6-7 (Ct. App. Oct. 21, 2021) (quoting *Coffee Sys. of Atlanta v. Fox*, 227 Ga. 602, (1971) *and Elec. Data Sys. Corp. v. Heinemann*, 268 Ga. 755, 757 (1997)) (emphasis added).

99.    When drafting the non-compete provision, DH Pace ignored the guidance of the RCA.  It did not include any geographic limitation or a description of the restricted activities, resulting in a Universe-wide "any capacity" non-compete.

100.    DH Pace's obvious overreaching should not be rewarded.  Nor should individuals and small companies such as Defendants be forced to engage in extremely costly litigation to safeguard their rights.

101.    If courts were to freely modify covenants for employers, it will only

encourage employers to draft broader and vaguer covenants and create "an in terrorem effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor." *Richard P. Rita Pers. Servs. Int'l, Inc. v. Kot*, 229 Ga. 314, 317 (1972) (quoting Harlan M. Blake, 73 Harv. L. Rev. 625 (Feb. 1960)).

### In The Event The Court Found Any Of The Relevant Covenants Enforceable Or Capable Of Modification Under The RCA, The Covenants Nevertheless Fail Because The RCA Is Unconstitutional And The Covenants Fail Under Common Law

102.   The RCA is violative of Article III, Section VI, Paragraph V(c) the Georgia Constitution and the referendum/enabling amendment ("Amendment One") related thereto was, itself, unconstitutional and its language perpetrated an intentional deception upon Georgia voters.

103.   Amendment One (which appeared on the November 2, 2010 general election ballot, ultimately led to the enactment of the RCA and purportedly provided a constitutional basis therefore), deceptively stated:

> **Shall the Constitution of Georgia be amended so as to make Georgia more economically competitive by authorizing legislation to uphold reasonable competitive agreements?**

104.   It is widely understood and accepted by practitioners and commentators in this area of the law and others that the vast majority of voters, in fact, did not know what they were actually voting for, and the referendum passed.

105.    Importantly, there were numerous prior versions of the enabling referendum which, as shown below, became more and more vague and deceptive with each version evidencing an attempt by segments of the General Assembly to deceive the electorate into voting "yes" on Amendment One.  The first version stated:

> **Shall the Constitution of Georgia be amended so as to authorize the General Assembly to provide for contracts that limit during or after the term of employment or of a commercial relationship and to authorize the courts to cure legal defects in such contracts in order to protect legitimate interests and achieve the intent of the parties?[4]**

106.    This first version at least mentioned "employment", but apparently was nevertheless determined to be too descriptive.  As a result, the second version stated:

> **Shall the Constitution of Georgia be amended so as to permit the General Assembly to enact laws that authorize contract provisions restricting or regulating competitive activities and enable courts to ensure the reasonableness of such contracts?[5]**

107.    Not satisfied with the reduction of detail, the third version stated:

> **Shall the Constitution of Georgia be amended so as to permit the General Assembly to enact laws that authorize contract provisions**

---

[4]     *See* H.R. Doc. No. LC 21 0239, 150th Leg., Reg. Sess. (Ga. 2009), available at http://www .legis.ga.gov /Legislation/20092010/87949.pdf.

[5]     *See* H.R. Doc. No. LC 29 4148ERS, 150th Leg., Reg. Sess. (Ga. 20l0), available at http://www.legis.ga.gov/Legislation /20092010/99870.pdf.

**regulating competitive activities and to enable courts to ensure the reasonableness of such contracts?[6]**

108.   Again not deceptive enough, the fourth version stated:

**Shall the Constitution of Georgia be amended so as to permit the General Assembly to enact laws that authorize contract provisions regarding competitive agreements to enable courts to uphold the agreements and to enable courts to ensure the reasonableness of such contracts?[7]**

109.   Apparently finding this fourth version still insufficiently deceptive, the

General Assembly committees settled upon the following which was approved by a

majority of Georgia voters who obviously, from the language below, would have no

real idea as to what they were actually voting for:

**Shall the Constitution of Georgia be amended so as to make Georgia more economically competitive by authorizing legislation to uphold reasonable competitive agreements?[8]**

110.   Such language was affirmatively and purposefully misleading to the

electorate as to exactly what they were voting for or against and deprived Georgia

voters their due process and other rights guaranteed by the Georgia and United States

Constitutions.

---

[6]    *See* H.R. Doc. No. LC 29 4174ERS, 150th Leg., Reg. Sess. (Ga. 2010), available at http://www.legis.ga.gov/Legislation/20092010/103086.pdf.

[7]    *See* H.R. Doc. No. LC 29 4349ERS, 150th Leg., Reg. Sess. (Ga. 20 10), available at http://www.legis.ga.gov/Legislation/20092010/104350.pdf.

[8]    *See* H.R. Doc. No. LC 29 4425ERS, 150th  Leg.  Reg.  Sess. (Ga. 2010), available at http:// www.legis.ga.gov /Legislation/20092010/106505.pdf.

111.   It is further important to note that the RCA's enabling Amendment does not relate to the General Assembly's General Powers.   Instead, the enabling Amendment addresses a specific power of the General Assembly that the Georgia Constitution expressly took away (i.e., the ability to legislate in the area of restraints of trade). *See generally*, Ga. Const. Art. III § VI, para. V (identifying the "specific limitations" on the General Assembly's General Powers"); *see also* Ga. Const. Art. III, § VI, para. V(c) (one of the specific limitations is that the General Assembly cannot legislate in the area of restrictive covenants) (amended by Ga. Const. Art. III, § VI, para. V(c)(l)-(3)).

112.   Referendum language should be subject to strict review when, as here, the General Assembly is attempting to lift specific limitations on its powers under the Georgia Constitution through a ballot referendum which clearly was designed to and did deceive the electorate.

113.   This Court possesses and should exercise its power of judicial review provided by the Georgia and United States Constitutions and find the RCA unconstitutional.[9]

---

[9] The Georgia Constitution specifically provides: "Legislative acts in violation of this Constitution or the Constitution of the United States, are void, and the judiciary shall so declare them." Ga. Const. Art. I, § II, para. V.

114.   Moreover, the enactment of the RCA by and through the purposefully misleading Amendment One has actually discouraged the rise of new competitors within various industries and limited employee freedom and viability thus causing a negative economic impact on the State of Georgia.

115.   The RCA is further unconstitutional, in whole or in part, due to numerous material vague and ambiguous provisions. *See Jekyll Island–State Park Auth. v. Jekyll Island Citizens Assn.,* 266 Ga. 152, 153(2), 464 S.E.2d 808 (1996) ("A statute must be definite and certain to be valid, and when it is so vague and indefinite that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, it violates the first essential of due process of law. To withstand an attack of vagueness or indefiniteness, a civil statute must provide fair notice to those to whom the statute is directed and its provisions must enable them to determine the legislative intent.") (internal citations and punctuation omitted).

116.   Because the RCA is unconstitutional, the restrictive covenants contained in the Agreement must be interpreted under Georgia common law and found unenforceable in light of fatal facial and other deficiencies discussed below.

## The Non-Compete Provision is Facially Invalid Under Common Law

117.   The non-compete provision is facially unenforceable under common law because it contains no geographic limitation. *Beckman v. Cox Broadcasting Corp.*, 250 Ga. 127, 129, 296 S.E.2d 566 (1982) (restrictions in non-compete agreements "not limited in territorial effect" are unenforceable); *Paramount Tax & Accounting, LLC v. H&R Block Eastern Enterprises, Inc.*, 299 Ga. App. 596, 683 S.E.2d 141 (2009) (language in noncompetition covenant unenforceable because it failed to limit prohibited conduct to a specific geographic area and would prevent employee from accepting employment anywhere in the United States); *Peachtree Fayette Women's Specialists, LLC v. Turner*, 305 Ga.App. 60, 699 S.E.2d 69 (2010) (non-compete covenant found overbroad where it extended to geographical areas where the employee never worked for former employer); *Dent Wizard Intern. Corp. v. Brown,* 272 Ga.App. 553, 612 S.E.2d 873 (2005) (four (4)-county territorial restriction in non-compete clause of the employment contract between the parties was overly broad warranting the grant of an interlocutory injunction enjoining employer from enforcing the relevant covenants where the undisputed evidence showed that employee had worked in only two or three out of the four (4) Georgia counties comprising the restricted territory).

118.   The non-compete provision is further facially unenforceable under common law because it generally prohibits competition by M. Johnson in any

capacity. *Hulcher Services v. R.J. Corman R.R. Co., L.L.C. et al.*, 247 Ga. App. 486, 492, 543 S.E. 2d 461 (2001) (restrictions in a non-compete agreement must be limited to the same or similar capacity in which the employee served the former employer seeking to enforce the non-compete and cannot apply to prevent competition in "any capacity"); *Fluerry v. AFAB, Inc.*, 205 Ga. App. 642, 643, 423 S.E.2d 29 (1992) (covenant not to compete unreasonable because former employee prohibited from working in any capacity for a competitor and because covenant fails to specify with any particularity the activity former employee is prohibited from performing).

<u>The No-Hire Provision is Facially Invalid Under Common Law</u>

119.   The no-hire provision is facially invalid under common law because it bars M. Jones from even unsolicited contact with DH Pace employees. *Cox,* 308 Ga. App. at 32 ("The nonrecruitment provision is likewise invalid on its face because it bars Cox from even unsolicited contact with Altus employee.").

## COUNT ONE: DECLARATORY JUDGMENT

120.   Defendants re-allege and adopts Paragraphs 1-119 of these Counterclaims as if set forth herein.

121.   Defendants reasonably believe that the relevant restrictive covenants in the Agreement are unenforceable for the reasons detailed herein, but request this

Court settle and afford them with certainty and declaratory relief in this regard. Conversely, DH Pace contends and undoubtedly will continue to contend that the relevant restrictive covenants are enforceable and binding.

122.   M. Jones desires and intends to continue to engage in his chosen field and fully pursue his opportunities to provide services within the garage door industry to any employer of his choosing in any geographic area, without the threat of being penalized substantial sums of money for doing so.  Liberty desires to continue to employ M. Johnson.  Defendants reasonably believe that DH Pace will continue to take action to attempt to enforce the above-described unlawful restrictive covenants against them to prevent and/or dissuade them from pursuing their business interests.

123.   A substantial, justiciable, and actual controversy exists between Defendants and DH Pace concerning the enforceability of the relevant restrictive covenants of the Agreement discussed herein.

124.   Defendants are interested parties and are insecure and uncertain as to their legal rights, interests, status and legal relations because of the relevant restrictive covenants in the Agreement.  Absent relief from this Court declaring their rights at law, Defendants will be hindered in their ability to earn a living in their chosen field of endeavor.  Defendants respectfully request this Court settle and afford them with certainty and declaratory relief in this regard.

125.   The ends of justice require that the Court should take such requested action for the protection of Defendants.

126.   Defendants will suffer extreme economic hardship and irreparable harm if the requested declaratory judgment is not granted by this Court.

127.   Defendants pray that the Court enter a final Declaratory Judgment that the relevant restrictive covenants of the Agreement are unenforceable against them, both facially and as applied under the RCA and/or as a matter of Georgia common law, and that the RCA is unconstitutional.

128.   Alternatively, Defendants pray that the Court, if its finds the RCA constitutional: (1) declare that enforcement of the relevant covenants will impose an undue economic hardship upon them and thus find the covenants unreasonable pursuant to O.C.G.A. § 13-8-58(d); and (2) declare that the covenants are unenforceable and incapable of modification irrespective of the enforceability of the other provisions of the Agreement.

## COUNT TWO: TEMPORARY AND PERMANENT INJUNCTION

129.   Defendants re-allege and adopt Paragraphs 1-128 of these Counterclaims as if set forth herein.

130.   Defendants have a substantial likelihood of success to prevail on their merits of their claims for declaratory relief in this matter related to the facially unenforceable and un-modifiable restrictive covenants in the Agreement.

131.   Defendants will be irreparably harmed if DH Pace is allowed to take any legal or other action against them related to the enforcement of the unlawful restrictive covenants in the Agreement.

132.   Given the f a c i a l unenforceability of the relevant restrictive covenants under Georgia law, the likelihood of irreparable harm that will befall Defendants if DH Pace is allowed to pursue further enforcement of the covenants far outweighs the potential harm to DH Pace if this Court were to grant the injunctive relief requested herein.

133.   The public policy of the State of Georgia would not be adversely affected and, in fact, would be upheld if this Court grants the requested injunctive relief in favor of Defendants and against DH Pace in that Defendants only seek to prevent DH Pace from doing what it has no right to do – take action to enforce the facially unenforceable restrictive covenants.

134.   Defendants are without an adequate remedy at law to prevent further legal action against them by DH Pace based on the facially unenforceable restrictive covenants which violate the public policy and Constitution of the State of Georgia.

135.   Defendants are therefore entitled to temporary and permanent injunctive relief enjoining DH Pace and any associated person or entity acting on its behalf, from attempting, in any way, and in any forum or jurisdiction: (i) to enforce the facially unenforceable and inapplicable and restrictive covenants; (ii) to seek to recover damages or other remedies based upon the restrictive covenants; or, (iii) to take any action to preclude, disrupt or interfere with M. Johnson's employment with Liberty.

## COUNT THREE: ATTORNEYS' FEES AND COSTS

136.   Defendants re-allege and adopt Paragraphs 1-135 of these Counterclaims as if set forth herein.

137.   DH Pace knew or should have known prior to filing its Verified Complaint that the relevant restrictive covenants in the Agreement are facially unenforceable for the reasons set forth herein.

138.   By filing and failing to dismiss its claims in the Verified Complaint based on the facially unenforceable restrictive covenants in the Agreement, DH Pace has forced Defendants to retain and continue to retain the undersigned Firm to respond to the claims of the Verified Complaint and to further seek the relief requested herein thus incurring significant legal fees and costs.

139.   DH Pace has thus acted in bad faith, been stubbornly litigious, and has caused Defendants unnecessary trouble and expense entitling them to an award of attorneys' fees pursuant to O.C.G.A. § 13-6-11.

140.   Defendants should be further entitled to an award of attorney fees and costs pursuant to the "Attorneys Fees" provision in the Agreement.

141.   Defendants are further entitled to an award of attorney fees and costs pursuant to O.C.G.A. § 10-1-764 because DH Pace has brought its claims under the GTSA in bad faith.

142.   Defendants are further entitled to an award of attorney fees and costs pursuant to U.S.C. § 1836 (b)(3)(D) because DH Pace has brought its claims and sought injunctive relief under the DTSA in bad faith.

**WHEREFORE**, Defendants respectfully pray as follows:

a)   That the Court immediately hear their request for temporary injunctive relief and consolidate such hearing with the hearing scheduled on April 12, 2022 on Plaintiff's Motion for TRO [Doc. 9];

b)   That the claims for damages and other relief in Plaintiff's Complaint asserted against Defendants all be dismissed with prejudice;

c)      That the Court temporarily and permanently enjoin DH Pace and any associated person or entity acting on its behalf, from attempting or threatening, in any way, and in any forum or jurisdiction:

(i) to enforce the unlawful restrictive covenants against Defendants; (ii) to seek to recover damages or other remedies based upon any alleged violation of the restrictive covenants; and, (iii) to take any action to preclude, disrupt or interfere with M. Johnson's employment with Liberty;

d)      That the Court declare the RCA unconstitutional;

e)      That the Court grant Defendants requested declaratory relief;

f)      That all costs of this action be cast upon DH Pace including Defendants attorneys' fees, court costs, and all expenses incurred in this litigation;

g)      That the Court grant Defendants any further it deems just and appropriate under the circumstances.

Respectfully submitted this 1st day of March 2023,

HALL, GILLIGAN, ROBERTS & SHANLEVER, LLP

*/s/ Wayne M. Cartwright*
David A. Roberts
Georgia Bar No. 608444
droberts@hgrslaw.com
Wayne M. Cartwright
Georgia Bar No. 257328
wcartwright@hgrslaw.com
3340 Peachtree Road, N.E.

Suite 1900
Atlanta, Georgia 30326-1082
T: (404) 247-0994
F: (404) 537-5555

Attorneys for Defendants

## CERTIFICATE OF SERVICE AND
## COMPLIANCE WITH FONT SIZE AND TYPE

I hereby certify that the foregoing has been prepared with Times New Roman font in 14-point size, as approved by the Court in N.D. Ga. Local Rule 5.1(c).

I further certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF systems which will automatically send email notification of such filing to the following attorney of record:

Stephen T. LaBriola
slabriola@fellab.com
Ethan Knott
eknott@fellab.com
Sharika Zutshi
Sharika.zutshi@gmail.com

This 1st day of March 2023,

/s/ *Wayne M. Cartwright*
Wayne M. Cartwright